[Cite as *State ex rel. Repository v. Nova Behavioral Health, Inc.*, 112 Ohio St.3d 338, 2006-Ohio-6713.]

THE STATE EX REL. REPOSITORY *v.* NOVA BEHAVIORAL HEALTH, INC.

[Cite as *State ex rel. Repository v. Nova Behavioral Health*, *Inc.*,

112 Ohio St.3d 338, 2006-Ohio-6713.]

*Public records—R.C. 149.43—Determination whether private corporation contracting with government agency is a "public institution" under R.C. 149.011(A)—Functional-equivalency test—Status of community mental-health agency contracting with county mental-health board established under R.C. 340.01.*

(No. 2005-0813 ─ Submitted March 29, 2006 ─ Decided December 28, 2006.)

IN MANDAMUS.

_____

PFEIFER, J.

{¶ 1} This is an original action for a writ of mandamus to compel a private, nonprofit corporation to provide access to certain records under the Public Records Act, R.C. 149.43. For the reasons that follow, we deny the writ.

I. Community Mental-Health Services

{¶ 2} R.C. Chapter 340 was enacted to, among other things, "[e]stablish a unified system of treatment for mentally ill persons" and "[f]oster the development of comprehensive community mental health services, based on recognized local needs, especially for severely mentally disabled children, adolescents, and adults." R.C. 340.011(A)(1) and (5). As explained by the Ohio Department of Mental Health ("ODMH"), "[t]his public system serves as a safety net, providing care for the uninsured and compensating for inadequate benefits in commercial health insurance plans."

{¶ 3} According to R.C. 340.01(B), "[a]n alcohol, drug addiction, and mental health service district shall be established in any county or combination of

counties having a population of at least fifty thousand," and any county or combination of counties having a population of less than 50,000 may establish such a district. "For each alcohol, drug addiction, and mental health service district, there shall be appointed a board of alcohol, drug addiction, and mental health services of eighteen members." R.C. 340.02. According to ODMH, "[t]he Department funds, reviews and monitors community mental health programs coordinated by 50 county-level boards serving all 88 counties."

{¶ 4} As relevant here, an alcohol, drug-addiction, and mental-health services board ("ADAMH board") has three primary responsibilities under the statute. First, it is required to "[s]erve as the community mental health planning agency for the county or counties under its jurisdiction." R.C. 340.03(A)(1). In so doing, the board must "develop and submit to the department of mental health * * * a community mental health plan," "submit an allocation request for state and federal funds," and "implement the plan approved by the department." R.C. 340.03(A)(1)(c).

{¶ 5} Second, an ADAMH board must "enter into contracts with public and private community mental health agencies for the provision of community mental health services listed in section 340.09 of the Revised Code and included in the board's community mental health plan." R.C. 340.03(A)(8)(a). Only in certain narrowly defined circumstances when "there is no other qualified private or public * * * community mental health agency that is immediately available" is an ADAMH board permitted to provide a community mental-health service, and then only for a limited time or on a limited basis. R.C. 340.03(A)(8)(b).

{¶ 6} Third, an ADAMH board is obligated to monitor the community mental-health agencies with which it contracts. Specifically, the board must "[i]nvestigate, or request another agency to investigate, any complaint alleging abuse or neglect of any person receiving services from a community mental health agency," "review and evaluate the quality, effectiveness, and efficiency of

services provided through its community mental health plan and submit its findings and recommendations to the department of mental health," and "[a]udit * * * at least annually all programs and services provided under contract with the board." R.C. 340.03(A)(2), (4), and (6). According to ODMH, as of May 2005, there were approximately 500 community mental-health agencies operating in Ohio.

## II. Stark County CMHB and Nova

{¶ 7} The Stark County Community Mental Health Board ("Stark County CMHB") was established in 1967 to serve as the community mental-health planning agency for Stark County. In 2004, the Stark County CMHB had $30.1 million in revenue, approximately two-thirds of which was from state and local tax funding, with most of the remainder from federal subsidies. That same year, the Stark County CMHB disbursed $23.8 million, or approximately 79 percent of its revenue, among organizations with which it had contracts for the provision of community mental-health services. Respondent, Nova Behavioral Health, Inc. ("Nova"), is one of 14 organizations with which Stark County CMHB has such contracts.

{¶ 8} Nova is a private, nonprofit Ohio corporation that was created in 1997 by the merger of three different nonprofit mental-health corporations. Nova's purpose, as described in its articles of incorporation, is to "improve the quality of life of the citizens of our communities by providing exemplary behavioral health care to members of these communities." According to its own projections in September 2004, Nova would receive $8.89 million in revenue for mental-health services, 92 percent or $8.17 million of which would be compensation by contract from the Stark County CMHB. Nova did not, however, receive any direct public funding, financing, or subsidies. It maintained its own facilities, established the terms and conditions of employment for its staff, and

maintained its own retirement plan. Nova's employees are not covered under the Ohio Public Employees Retirement System.

{¶ 9}   In light of the statutory obligation of an ADAMH board to monitor its service providers, the fiscal year 2005 contract between the Stark County CMHB and Nova provided:

{¶ 10} "6.3.  Access to Records and Information

{¶ 11} "The Provider shall make available to the Board or its designated representative, for review, all records and data pertaining to payments, claims and services rendered to members under this Agreement.  The Provider shall allow duplication of such records during business hours.

{¶ 12} "The Provider shall permit the Board, state, and federal agencies acting through their agents or representatives to visit, examine, inspect, and review the Provider, its operations, programs, activities, and its financial and personnel records pursuant to this Agreement all at reasonable times and upon reasonable notice.

{¶ 13} "The Board's Executive Director or designee may obtain immediate access to information without prior notice, including access to staff, individual client records and client accounts, when such information is reasonably related to allegations of abuse or neglect of a client being investigated or to prevent imminent harm to clients."

### III.  Records Requests and Mandamus

{¶ 14} In late summer or early fall of 2004, Nova became aware of allegations by female patients that Dennis Bliss, an employee and mental-health counselor for Nova, was using counseling techniques that were sexually suggestive or otherwise improper.  Sometime prior to April 8, 2005, Nova suspended Bliss without pay, pending an investigation into the matter by the Stark County CMHB.  At a special board meeting on April 7, 2005, the executive director of the Stark County CMHB stated that there was evidence that

4

"professional boundaries were crossed with women who came forward to complain."

{¶ 15} On April 8, 2005, a staff writer for relator, the Repository, a daily newspaper of general circulation in Stark County, requested that Nova provide access to Bliss's personnel file. Nova rejected the request, stating, "[T]he only way we release any personnel files is with a release from the employee." On April 20, 2005, the Repository reiterated its request for Bliss's personnel file. On April 22, 2005, Nova denied the request, stating, "[W]e do not feel that Nova Behavioral Health, Inc., a private, nonprofit, contract agency, is subject to Ohio Revised Code Section 149.43 in that it is not a 'public agency.' "

{¶ 16} On May 5, 2005, the Repository filed this action for a writ of mandamus to compel Nova to allow the Repository to inspect and copy all nonexempt portions of Bliss's personnel file. After Nova answered, the court granted an alternative writ, 106 Ohio St.3d 1458, 2005-Ohio-3490, 830 N.E.2d 1167, and issued a schedule for evidence and briefs. In June 2005, the Stark County CMHB informed Nova that it would no longer be paid for non-Medicare services. Based on the loss of this revenue, Nova's board of trustees voted to cease all operations and close effective August 5, 2005.

{¶ 17} The parties filed evidence and briefs, and Ohio Council of Behavioral Health Providers submitted an amicus curiae brief in support of Nova. Oral argument was conducted on March 29, 2006.

### IV. R.C. 149.43

{¶ 18} The Repository seeks a writ of mandamus to compel Nova to provide access to an employee's personnel file under R.C. 149.43. "Mandamus is the appropriate remedy to compel compliance with R.C. 149.43, Ohio's Public Records Act." *State ex rel. Dispatch Printing Co. v. Johnson*, 106 Ohio St.3d 160, 2005-Ohio-4384, 833 N.E.2d 274, ¶ 16. "We construe R.C. 149.43 liberally in favor of broad access and resolve any doubt in favor of disclosing records."

*State ex rel. Plain Dealer Publishing Co. v. Cleveland*, 106 Ohio St.3d 70, 2005-Ohio-3807, 831 N.E.2d 987, ¶ 20.

{¶ 19} The primary issue in this case is whether Nova, a private, nonprofit corporation providing community mental-health services under contract with the Stark County CMHB, is a public office for purposes of the Public Records Act. " 'Public record' means records kept by any public office * * *." R.C. 149.43(A)(1). " 'Public office' includes any state agency, public institution, political subdivision, or other organized body, office, agency, institution, or entity established by the laws of this state for the exercise of any function of government." R.C. 149.011(A). The Repository does not assert that Nova, while operational, was a state agency, political subdivision, or other organized body, office, agency, institution, or entity established by the laws of this state for the exercise of any function of government. Instead, the Repository contends that Nova was a "public institution" under R.C. 149.011(A) and thus a public office subject to R.C. 149.43.

V. Public Institutions and the Functional-Equivalency Test

{¶ 20} When this cause was submitted on March 29, 2006, the court was using different tests to determine whether a particular entity was a public institution for purposes of the Public Records Act. In cases where the entity in question was a hospital, the court applied a three-part test: "[I]f we find that a particular hospital is a public hospital, renders a public service to residents, and is supported by public taxation, we must hold that it is a public office required to disclose its public records." *State ex rel. Fostoria Daily Rev. Co. v. Fostoria Hosp. Assn.* (1988), 40 Ohio St.3d 10, 12, 531 N.E.2d 313. See, also, *State ex rel. Fox v. Cuyahoga Cty. Hosp. Sys.* (1988), 39 Ohio St.3d 108, 529 N.E.2d 443, paragraph one of the syllabus; *State ex rel. Stys v. Parma Community Gen. Hosp.* (2001), 93 Ohio St.3d 438, 440, 755 N.E.2d 874. In cases involving other entities, the court applied a two-part test: "An entity organized for rendering

6

service to residents of the community and supported by public taxation is a public institution." *State ex rel. Freedom Communications, Inc. v. Elida Community Fire Co.* (1998), 82 Ohio St.3d 578, 579, 697 N.E.2d 210.

{¶ 21} The court has since modified the test for determining a private entity's status as a public institution under R.C. 149.011(A). In *State ex rel. Oriana House, Inc. v. Montgomery*, 110 Ohio St.3d 456, 2006-Ohio-4854, 854 N.E.2d 193, at the syllabus, the court held:

{¶ 22} "1. Private entities are not subject to the Public Records Act absent a showing by clear and convincing evidence that the private entity is the functional equivalent of a public office.

{¶ 23} "2. In determining whether a private entity is a public institution under R.C. 149.011(A) and thus a public office for purposes of the Public Records Act, R.C. 149.43, a court shall apply the functional-equivalency test. Under this test, the court must analyze all pertinent factors, including (1) whether the entity performs a governmental function, (2) the level of government funding, (3) the extent of government involvement or regulation, and (4) whether the entity was created by the government or to avoid the requirements of the Public Records Act."

{¶ 24} We adopted the functional-equivalency test in *Oriana House* because it is best suited to the overriding purpose of the Public Records Act, which is "to allow public scrutiny of public offices, not of all entities that receive funds that at one time were controlled by the government." Id. at ¶ 36. By homing in on the functional realities of a particular contractual arrangement, the functional-equivalency test provides greater protection against unintended public disclosures while affording a more suitable framework for determining the extent to which an entity has actually assumed the role of a governmental body.

{¶ 25} Although the functional-equivalency test was not formally a part of Ohio public-records law while the present cause was being argued, we find it

unnecessary for the parties to restate their positions in light of this change. In *Oriana House*, the court explained that in cases decided under the former tests, it has "considered factors similar to the factors in the functional-equivalency test in making the determination" whether an entity is a public institution. Id. at ¶ 24. In discussing the application of our previous tests to the facts of this case, the parties have identified and addressed all of the factors that are relevant in a functional-equivalency analysis, and we can easily adjust their arguments where required.

VI.   Application of the Functional-Equivalency Test to Nova

A.   Governmental Function

{¶ 26} Pursuant to its contract with the Stark County CMHB, Nova was obligated to provide mental-health services to residents of Stark County and others who qualified for coverage under the community mental-health plan for Stark County. By virtue of this contract, Nova was a community mental-health agency as defined in R.C. 5122.01(H), but it was not ipso facto a public office for purposes of the Public Records Act. R.C. 340.03(A)(8)(a) expressly provides for the participation of both "public and private community mental health agencies * * * in the board's community mental health plan." Cf. *Jackson v. New Ctr. Community Mental Health Servs.* (1987), 158 Mich.App. 25, 35, 404 N.W.2d 688.

{¶ 27} In *Oriana House*, we held that a private entity operating a community-based correctional facility under contract with a judicial corrections board "is performing a historically governmental function" because "[t]he administration of prisons has traditionally been a uniquely governmental function." Id. at ¶ 28. Applying this test, we conclude that a private entity that provides community mental-health services under contract with an ADAMH board is not performing a historically governmental function, because "providing mental health services has not been a power which has traditionally been exclusively reserved to the state." *Wolotsky v. Huhn* (C.A.6, 1992), 960 F.2d 1331, 1335 (applying a "public function" test to determine whether a private

community mental-health agency is a "state actor" for purposes of Section 1983, Title 42, U.S.Code).

{¶ 28} Nor are we presented with the situation in which a public agency transfers one of its own functions to a private entity. See, e.g., *Memphis Publishing Co. v. Cherokee Children & Family Servs., Inc.* (Tenn.2002), 87 S.W.3d 67, 79 (crux of analysis is whether governmental agency is "contractually delegating its responsibilities to a private entity," and "the record reflects that [the Tennessee Department of Human Services] directly performed [child-care] services prior to entering into the contracts with [a private entity]"); *Marks v. McKenzie High School Fact-Finding Team* (1994), 319 Ore. 451, 464, 878 P.2d 417 ("The investigatory function to be performed by defendant was sufficiently related to the statutory duties of the school board to weigh in favor of finding that defendant is a 'public body' ").

{¶ 29} Nothing in the record or the enabling legislation suggests that the Stark County CMHB directly performed, had a legal duty to perform, or was generally statutorily authorized to provide community mental-health services prior to entering into the contract with Nova. Indeed, R.C. 340.03(A)(8)(b) generally prohibits an ADAMH board from providing a community mental-health service.

{¶ 30} We agree with the Repository, however, that "[t]he provision of * * * a 'safety net' [to provide care for mental illnesses inadequately covered by commercial insurance] is uniquely a government function." Providing mental-health care for the uninsured and compensating for the inadequacy of benefits in commercial health-insurance plans is not a function commonly performed by private entities. Although there is no specific statutory provision to this effect, the ODMH's intent in this regard is manifest and entirely consistent with the beneficent purposes of the legislation. In any event, the contract between Nova and the Stark County CMHB expressly provided that mental-health services are

"to be made available to all members of the community regardless of their ability to pay." See *Memphis Publishing*, 87 S.W.3d at 79 ("providing child care services for indigent families * * * [was] undeniably public in nature"); *Stys*, 93 Ohio St.3d at 442, 755 N.E.2d 874 ("Unlike the lease in *Fostoria*, however, the lease agreement in the present case does not stipulate that Parma Hospital must serve the public regardless of * * * ability to pay").

{¶ 31} Thus, Nova was performing a governmental function to the extent that it contracted to provide mental-health services to Stark County residents regardless of their ability to pay.

### B. Level of Government Funding

{¶ 32} Approximately 92 percent of Nova's revenue from mental-health services came from its contract with the Stark County CMHB. Even if Nova's revenue from alcohol- and drug-addiction services is factored into the calculation, Nova still received 87 percent of its total revenues from the Stark County CMHB. In turn, the Stark County CMHB received virtually all of its revenues from public sources.

{¶ 33} The level of government funding is therefore significant, especially considering that Nova ceased its operations because of the loss of most of its revenues from the contract with the Stark County CMHB.

### C. Extent of Government Involvement or Regulation

{¶ 34} There is no evidence that the Stark County CMHB or any other governmental body controlled the day-to-day operations of Nova. The statutory monitoring requirements, as well as the various contractual terms that the Repository cites as examples of "the high degree of control the Board has over Respondent," do not constitute day-to-day government supervision. These requirements and stipulations constitute only the control necessary to ensure that government funds are properly used and to protect the government's interest in the development of an effective community-based mental-health system. Cf. *Ry.*

10

*Labor Executives' Assn. v. Consol. Rail Corp.* (D.C.D.C.1984), 580 F.Supp. 777, 779.

{¶ 35} In fact, R.C. 340.03(A)(8)(b) specifically withholds from ADAMH boards the authority "to administer or direct the daily operation of any facility or community mental health agency." And while this provision does permit a community mental-health agency "to receive administrative services or staff direction from the board," it specifies that such assistance is to be provided "under the direction of the governing body of the facility or agency." Moreover, Nova maintained its own facilities, retirement plan, and accreditation surveys, and nothing in the records suggests that any of Nova's employees or board members were government employees or officials.

{¶ 36} Nova was therefore a self-directed, independent, private corporation.

### D. Creation of Entity

{¶ 37} Nova was created as a private, nonprofit corporation. While its incorporators may well have envisioned and even depended on procuring a government contract with an ADAMH board, Nova was not established by a governmental entity or pursuant to any special legislation. No law required Nova's creation; no statute required it to be funded or remain in existence. Nor is there any indication in the record that Nova was created or used by the government to avoid the requirements of the Public Records Act.

### E. Weighing of Factors

{¶ 38} Considering the totality of the foregoing factors, we hold that Nova is not a public institution and thus not a public office subject to the Public Records Act. Nova performed a uniquely governmental function only to a limited extent; the provision of mental-health services generally is not a historically or uniquely governmental function. Nova's operations were independent of government. The Stark County CMHB did not make decisions for or control or

direct the day-to-day operations of Nova, either by contract or otherwise, and indeed was statutorily prohibited from doing so. Nova was not created by government or as the alter ego of a governmental agency. The only factor that is wholly in the Repository's favor is the level at which Nova was governmentally funded. But "[t]he fact that a private entity receives government funds does not convert the entity into a public office for purposes of the Public Records Act." *Oriana House*, 110 Ohio St.3d 456, 2006-Ohio-4854, 854 N.E.2d 193, at ¶ 29. The Public Records Act was not designed to allow public scrutiny of "all entities that receive funds that at one time were controlled by the government." Id. at ¶ 36.

{¶ 39} Providing public access to Nova's records does not serve the policy of governmental openness that underlies the Public Records Act.

## VII. Alternate Claim

{¶ 40} Relying on *State ex rel. Toledo Blade Co. v. Ohio Bur. of Workers' Comp.*, 106 Ohio St.3d 113, 2005-Ohio-6549, 832 N.E.2d 711, the Repository raises the alternate claim that even if Nova was not a public office, it was "the person responsible for the public record" under R.C. 149.43(C) and therefore subject to the Public Records Act.

{¶ 41} The Repository, however, waived this claim because it could have raised, but failed to raise, the claim in its complaint or amend its complaint to include it. We granted an alternative writ, and the parties submitted evidence based solely on the Repository's claim that Nova constituted a public office, and there is no indication that Nova consented to trial of the alternate claim. Under these circumstances, we need not address the merits of this alternate claim. See, e.g., *State ex rel. Taxpayers Coalition v. Lakewood* (1999), 86 Ohio St.3d 385, 391, 715 N.E.2d 179; *State ex rel. Musial v. N. Olmsted*, 106 Ohio St.3d 459, 2005-Ohio-5521, 835 N.E.2d 1243, ¶ 31.

**{¶ 42}** In any event, this cause is entirely distinguishable from the situation that was presented to us in the *Toledo Blade* case. In *Toledo Blade*, the Capital Coin Fund companies and their inventory were essentially owned by the Bureau of Workers' Compensation, and the requested records pertained to purchase and sale transactions involving what were essentially the bureau's coins. The Capital Coin Fund companies' records, to the extent they documented transactions concerning the bureau's coins, were therefore prepared in order to carry out the bureau's responsibility. To this extent, the companies were persons responsible for *the bureau's records*. In the present cause, however, no such relationship exists between the Stark County CMHB and Nova.

## VIII. Conclusion

**{¶ 43}** For all of the foregoing reasons, we hold that Nova was not the functional equivalent of a public office or a person responsible for public records. Nova, therefore, is not subject to the Public Records Act, and the writ of mandamus requested by the Repository is hereby denied.

Writ denied.

RESNICK, LUNDBERG STRATTON and LANZINGER, JJ., concur.

MOYER, C.J., O'CONNOR and O'DONNELL, JJ., dissent.

_____

**MOYER, C.J., dissenting.**

**{¶ 44}** I respectfully dissent. In *State ex rel. Oriana House, Inc. v. Montgomery*, 110 Ohio St.3d 456, 2006-Ohio-4854, 854 N.E.2d 193, this court adopted the functional-equivalency test and listed four factors to analyze in determining whether a private entity is a public office for purposes of the Public Records Act, R.C. 149.43. Id., syllabus. While I agreed with the adoption of the functional-equivalency test, I dissented in O*riana House* because I disagreed with the application of the test to the facts in that case. Id. at ¶ 39.

**{¶ 45}** In my dissent, I also disagreed with the majority's failure to give guidance as to the appropriate balancing of the different factors, id. at ¶ 41, and expressed my view that the second factor, the level of government funding, should be given more weight than other factors, id. at ¶ 46.

**{¶ 46}** In this case, as in *Oriana House*, I disagree with the conclusion of the majority that the application of the functional-equivalency test supports a finding that the custodian of the records, here Nova Behavioral Health, Inc. ("Nova"), is not a public office for purposes of the Public Records Act.

**{¶ 47}** I would apply the four-part functional-equivalency test to Nova as follows:

**{¶ 48}** 1. Governmental Function. As stated in the majority opinion, pursuant to its contract with the Stark County Community Mental Health Board ("Stark County CMHB"), Nova was obligated to provide mental-health services to residents of Stark County and others who qualified for coverage under the community mental-health plan, regardless of community members' ability to pay for the services. The majority applied the reasoning articulated in *Oriana House* to the facts of this case. In *Oriana House*, the majority found that Oriana House, a private entity operating a community-based correctional facility, was performing a "historically" and "uniquely" governmental function. Id. at ¶ 28. According to the majority in this case, the provision of mental-health services is not " 'a power which has traditionally been exclusively reserved to the state.' " Id. at 27, quoting *Wolotsky v. Huhn* (C.A.6, 1992), 960 F.2d 1331, 1335.

**{¶ 49}** I disagree with the majority's finding that the provision of mental-health services has not been "traditionally" or "historically" the function of the state. The era of establishing state-funded psychiatric hospitals began during the early 19th century. Joanmarie Ilaria Davoli*, No Room at the Inn: How the Federal Medicaid Program Created Inequities in Psychiatric Hospital Access for the Indigent Mentally Ill*, 29 Am. Journal of Law & Medicine (2003) 159, 168. In

the 1840s, a reform movement to improve care of the mentally ill resulted in major investments by states in the building and maintenance of psychiatric hospitals. Id.

{¶ 50} Further, the 1965 legislative history of Medicaid reveals legislators' perception that treatment of the mentally ill was the responsibility of the states: "The committee believes that responsibility for the treatment of persons in mental hospitals * * * is that of the mental health agency of the State." Senate Report No. 404 (Finance Committee, 1965), reprinted in 1965 U.S.Code Cong. & Adm. News, 1943, 2086, quoted in id. at 169. Following the development of Medicaid and the Medicaid exclusion of the majority of adults in psychiatric hospitals from its reimbursement program, states began to vastly reduce the number of institutionalized patients. Id. at 169-170. Since 1955, the removal of patients from state hospitals has depopulated them by approximately 93 percent. Id. at 174.

{¶ 51} With mentally ill patients no longer housed in state hospitals, community mental-health care has increased dramatically. Between 1981 and 1997, state psychiatric hospital expenditures decreased by 42.8 percent, while community mental-health spending increased by 58.9 percent. National Association of State Mental Health Program Directors Research Institute, Inc., State Profile Highlight, Closing and Reorganizing State Psychiatric Hospitals: 2000 (August 10, 2000), at http://www.nri-inc.org/SH_RPT.pdf (accessed Dec. 6, 2006). In fiscal 1997, expenditures controlled by state mental-health agencies for community mental-health services exceeded expenditures on state psychiatric hospital inpatient services by $2.5 billion. Id.

{¶ 52} A historical review of Ohio statutes supports the conclusion that the state of Ohio once assumed responsibility as the primary provider of care to the mentally ill. G.C. 1890-2 stated the purpose of the act that created the Division of Mental Diseases: "to provide humane and medical treatment and

care, preventive and curative, for mentally ill, insane, feeble-minded, and epileptic persons." 1937 Am.Sub.H.B. No. 545, 117 Ohio Laws 550. G.C. 1890-14 stated, "The state of Ohio shall have the care, custody, control and treatment of *all persons mentally ill or insane*, and of each person who shall be received into any hospital or institution under the control of this division. Except as provided in this act, no county, city or political subdivision shall establish or maintain any institution, hospital or home for the care, control and treatment of the mentally ill or insane." (Emphasis added.) Id.

{¶ 53} While family members and some private hospitals have also cared for the mentally ill over the last two centuries, this fact does not illuminate whether the provision of care for the mentally ill is a government function. Specifically, I disagree with the use of the word "exclusively" in the majority's reasoning. Evidence supports the conclusion that providing mental-health care for the mentally ill is a role that historically has been assumed by the state.

{¶ 54} In *Flagg Bros., Inc. v. Brooks* (1978), 436 U.S. 149, 172, 98 S.Ct. 1729, 56 L.Ed.2d 185, Justice Stevens dissented from a majority opinion that determined whether certain acts were state action for purposes of the Due Process Clause: "[T]he Court reasons that state action cannot be found because the State has not delegated * * * an *exclusive* sovereign function." (Emphasis sic.) In disagreeing with the majority, Justice Stevens argued that the term "exclusive" was misused: "Whether termed 'traditional,' 'exclusive,' or 'significant,' the state power [at issue in *Flagg Brothers*] is exactly the sort of power with which the Due Process Clause is concerned." Id. at 176, 98 S.Ct. 1729, 56 L.Ed.2d 185. While this case involves a different question of state action and state power, I agree with Justice Stevens's sentiments: whether the government function is termed "traditional," "historical," or "exclusive," the fact is that here the state assumed the responsibility of being the only provider of mental-health services to any Ohio citizen in need of those services.

{¶ 55} Though the majority does agree with the relator, the Repository, that the aspect of Nova providing mental-health care for the uninsured and others who are unable to pay is a government function, I think the evidence under the first prong of the functional-equivalency test is much stronger. Here, Nova was providing a service historically provided by the state of Ohio, and I believe that the evidence under this prong of the functional-equivalency test is in full support of finding Nova to be a public office for purposes of the Public Records Act.

{¶ 56} 2. Level of Government Funding. I agree that the fact that an entity receives public funds does not necessarily mean that the entity is a public office for purposes of the Public Records Act. *State ex rel. Strothers v. Wertheim* (1997)*, 80 Ohio St.3d 155,161, 684 N.E.2d 1239 (Moyer, C.J., dissenting).

{¶ 57} Nevertheless, the level of government funding is a most important factor and should be given more weight than other factors in the functional-equivalency test. *Oriana House*, 110 Ohio St.3d 456, 2006-Ohio-4854, 854 N.E.2d 193, at ¶ 46 (Moyer, C.J., dissenting). A private entity that receives the level of public funding that Nova received should not be permitted to keep the public from knowing how it has managed its public responsibilities. Id. at ¶ 47.

{¶ 58} Ninety-two percent of Nova's revenue from mental-health services came from its contract with the Stark County CMHB. Further, the Stark County CMHB received two-thirds of its $30.1 million total revenue from state and local tax funding. As stated by the majority: "The level of government funding is therefore significant, especially considering that Nova ceased its operations because of the loss of most of its revenues from the contract with the Stark County CMHB." ¶ 33.

{¶ 59} 3. Extent of Government Involvement or Regulation. I do not dispute the majority's conclusion that Nova was a self-directed, independent, private corporation. I also agree that the Stark County CMHB did not control the

day-to-day operation of Nova. Nevertheless, I do not agree that these facts require a finding that the government did not extensively regulate Nova.

{¶ 60} Under R.C. 340.03(A)(1), an alcohol, drug-addiction, and mental-health services board ("ADAMH board") shall "[s]erve as the community mental health planning agency for the county or counties under its jurisdiction." As one of its duties, an ADAMH board must "[e]nter into contracts with public and private facilities for the operation of facility services included in the board's community mental health plan." R.C. 340.03(A)(8)(a). The ADAMH board must "[a]udit * * * at least annually all programs and services provided under contract with the board." R.C. 340.03(A)(6).

{¶ 61} The contract between the Stark County CMHB and Nova highlights the extent of regulation exercised by the Stark County CMHB. Under Section 6.3, Nova was required to make available to the Stark County CMHB all records and data pertaining to payments, claims, and services rendered under the agreement. Sections 7.1 and 7.2 of the contract state, "All Provider organizations are expected to perform at agreed upon levels," and "All Providers are required to measure outcomes with the instruments and in the manner approved by the Board." Section 8.4 of the contract states: "The Provider [Nova] shall cooperate with the Board in all monitoring and review activities necessary to ensure compliance with the conditions of this agreement, Medicaid requirements and the requirements of the Ohio Department of Mental Health."

{¶ 62} The contract between the Stark County CMHB and Nova is evidence that the Stark County CMHB extensively regulated Nova's provision of mental-health services. Nova's records and data were required to be available to the Stark County CMHB for review, Nova's standards of performance were established by the Stark County CMHB, and Nova was required to allow the Stark County CMHB to monitor and review its performance in order to ensure that Nova was meeting the requirements imposed by the government. Although Nova

was responsible and independent as to its day-to-day operation, the provision of mental-health services was extensively regulated by the government.

{¶ 63} 4. Whether an Entity Was Created by the Government. Here, the facts are straightforward: Nova was created as a private, nonprofit corporation. However, as I stated in *Oriana House*, I would give this factor very little weight: "Surely even the majority would not hold that a private entity that receives all of its funds from public sources is not a public office. Again, the focus of the test should be upon the importance of public funds to the purposes and work of the private entity." 110 Ohio St.3d 456, 2006-Ohio-4854, 854 N.E.2d 193, ¶ 50 (Moyer, C.J., dissenting).

{¶ 64} If we balance the four factors of the functional-equivalency test, the evidence establishes that Nova is the functional equivalent of a public office and, thus, is subject to the Public Records Act. The provision of mental-health services has historically been a function of government, Nova received a vast majority of its funding from public sources, and the provision of mental-health services continues to be heavily regulated by the government. Further, the Public Records Act is to be construed liberally in favor of broad access, and any doubt is to be resolved in favor of disclosing records. *State ex rel. Plain Dealer Publishing Co. v. Cleveland*, 106 Ohio St.3d 70, 2005-Ohio-3807, 831 N.E.2d 987, ¶ 20. In my view, the evidence in this case and our duty to resolve doubt in favor of broad access require the holding that Nova is the functional equivalent of a public office for purposes of the Public Records Act.

{¶ 65} Therefore, because I would grant the writ of mandamus requested by the Repository and hold that Nova is the functional equivalent of a public office and thus subject to the Public Records Act, I respectfully dissent.

O'CONNOR and O'DONNELL, JJ., concur in the foregoing opinion.

_____

Wickens, Herzer, Panza, Cook & Batista Co., Richard D. Panza, William F. Kolis Jr., and Michael R. Niederbaumer, for relator.

Baker, Dublikar, Beck, Wiley & Mathews, John B. Lindamood, and James F. Mathews, for respondent.

Vorys, Sater, Seymour & Pease, L.L.P., G. Ross Bridgman, and Peter A. Lusenhop, urging denial of the writ for amicus curiae, Ohio Council of Behavioral Health Providers.

_____