[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Harm Reduction Ohio v. OneOhio Recovery Found.*, Slip Opinion No. 2023-Ohio-1547.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2023-OHIO-1547

THE STATE EX REL. HARM REDUCTION OHIO *v*. ONEOHIO RECOVERY FOUNDATION.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Harm Reduction Ohio v. OneOhio Recovery Found.*, Slip Opinion No. 2023-Ohio-1547.]

*Mandamus—Public-records requests—Considering totality of factors, nonprofit foundation established to allocate Ohio's share of settlement proceeds of national opioid litigation is functional equivalent of a public office for purposes of Public Records Act—Requester demonstrated by clear and convincing evidence that it has clear legal right of access to requested records and that foundation has clear legal duty to provide access—Writ granted, requests for statutory damages and attorney fees denied, and court costs awarded.*

(No. 2022-0966—Submitted February 28, 2023—Decided May 11, 2023.)

IN MANDAMUS.

_____

**Per Curiam.**

{¶ 1} Relator, Harm Reduction Ohio ("HRO"), seeks a writ of mandamus ordering respondent, OneOhio Recovery Foundation ("the Foundation"), to provide documents HRO requested under Ohio's Public Records Act, R.C. 149.43. HRO also seeks awards of statutory damages, court costs, and attorney fees.

{¶ 2} Emphasizing that it is a private nonprofit corporation, the Foundation contends that it is not a "public office" and therefore is not bound by the Public Records Act. HRO argues, however, that the Foundation is the functional equivalent of a public office under the test established in *State ex rel. Oriana House, Inc. v. Montgomery*, 110 Ohio St.3d 456, 2006-Ohio-4854, 854 N.E.2d 193.

{¶ 3} On the record before us, we agree with HRO. We therefore grant the requested writ and award HRO its court costs. But because the Foundation reasonably believed that it is not a public office under the Public Records Act, we deny HRO's requests for statutory damages and attorney fees.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Creation of the Foundation

{¶ 4} The state and several local governments are currently engaged in litigation against pharmaceutical-supply-chain participants that are alleged to be liable for contributing to the opioid epidemic.

{¶ 5} The Foundation is an Ohio nonprofit corporation established in December 2021. It was created under a memorandum of understanding ("MOU"), which the Foundation describes as "a contract between the State and the various local governments involved in the opioid litigation to plan for the allocation and use of Ohio's share of the national settlement proceeds." The governor and attorney general signed the MOU on behalf of the state; numerous local governments also agreed to be bound by the MOU. According to the state's "RecoveryOhio" website, local governments representing 85 percent of the state's population, including 73 of Ohio's 88 counties, are committed to the MOU.

https://recoveryohio.gov/resources/all-resources/aa-oneohio (accessed Apr. 7, 2023) [https://perma.cc/DG3G-PSLD].

{¶ 6} Under the MOU, the Foundation will receive 55 percent of all "opioid funds," which are defined as amounts obtained through the settlement of claims against a "pharmaceutical supply chain participant." The MOU states that the Foundation's governing board consists of 29 members:

- Six members selected by the State (five selected by the Governor and one selected by the Attorney General);
- Four members drawn from the Legislature
  o One representative selected by the President of the Ohio Senate;
  o One representative selected by the Ohio Senate Minority Leader;
  o One representative selected by the Speaker of the Ohio House of Representatives; and
  o One representative selected by the Ohio House Minority Leader[;]
- Eleven members with one member selected from each non-metropolitan Regio[n]; and
- Eight members, with one member selected from each metropolitan Regio[n].[1]

The MOU requires the governor to appoint an executive director of the Foundation. It further provides that the Foundation shall appoint a nine-member "expert panel"

---

1. For purposes of the Foundation's governance, the MOU divides the state into 19 regions, 11 of which are defined as multicounty, nonmetropolitan regions and 8 of which are single- or two-county metropolitan regions.

consisting of (1) six members chosen by the Foundation's board members representing the local governments, (2) two members chosen by the governor, and (3) one member chosen by the attorney general. The expert panel makes recommendations to the Foundation to ensure that all of the state's 19 regions created by the MOU can address the opioid epidemic. The MOU also provides guidelines for the disbursement of opioid-litigation settlement proceeds and contemplates that the Foundation may receive funds from other sources.

*B. HRO's Public-Records Request*

{¶ 7} HRO is a statewide nonprofit organization that works to prevent overdose deaths. In May 2022, HRO President Dennis Cauchon attempted to attend the first meeting of the Foundation's board of directors. The meeting was held at the Ohio Department of Public Safety and was organized by the interim director of the governor's "RecoveryOhio" office. Soon after arriving, however, Cauchon was told that members of the public were not permitted to attend the meeting.

{¶ 8} In June 2022, Cauchon emailed a public-records request to the Foundation, seeking "[a]ll documents prepared for the OneOhio Recovery Foundation Board for its June 23 meeting" as well as documents related to other, "unnoticed" board meetings, if any, held before June 23. Cauchon addressed the public-records request to multiple recipients "because it was unclear who [wa]s responsible for maintaining records, providing meeting notice and complying with Ohio law and the [MOU]." Addressees included the provisional board chair and secretary of the Foundation. HRO alleges that the Foundation did not respond to the request.

{¶ 9} HRO filed this original action in August 2022. It seeks a writ of mandamus directing the Foundation to allow access to the requested records, and it requests awards of statutory damages, court costs, and attorney fees. The Foundation filed an answer in which it denied that it is subject to the Public Records Act. We granted an alternative writ and ordered the parties "to brief and submit

evidence on whether the Public Records Act, R.C. 149.43, applies to [the Foundation]." 168 Ohio St.3d 1450, 2022-Ohio-3903, 198 N.E.3d 100.

## II. ANALYSIS

{¶ 10} Mandamus is an appropriate remedy to compel compliance with Ohio's Public Records Act. *State ex rel. Physicians Commt. for Responsible Medicine v. Ohio State Univ. Bd. of Trustees*, 108 Ohio St.3d 288, 2006-Ohio-903, 843 N.E.2d 174, ¶ 6; R.C. 149.43(C)(1)(b). To obtain a writ of mandamus, HRO must demonstrate, by clear and convincing evidence, a clear legal right to the requested relief and a clear legal duty on the part of the Foundation to provide it. *State ex rel. Cincinnati Enquirer v. Sage*, 142 Ohio St.3d 392, 2015-Ohio-974, 31 N.E.3d 616, ¶ 10.

{¶ 11} A "public record" is one kept "by any public office." R.C. 149.43(A)(1). The principal issue in this case is whether the Foundation is a "public office" under the Public Records Act, which defines "public office" as including "any state agency, public institution, political subdivision, or other organized body, office, agency, institution, or entity established by the laws of this state for the exercise of any function of government," R.C. 149.011(A). Emphasizing that it is "a private, not-for-profit entity," the Foundation contends that it is not a public office subject to the Public Records Act.

{¶ 12} As a general proposition, private entities are not subject to the Public Records Act. *See Oriana House*, 110 Ohio St.3d 456, 2006-Ohio-4854, 854 N.E.2d 193, at ¶ 26. In *Oriana House*, however, we held that a private entity is subject to the Public Records Act if there is "a showing by clear and convincing evidence that [it] is the functional equivalent of a public office." *Id*. Under the functional-equivalency test:

the court must analyze all pertinent factors, including (1) whether the entity performs a governmental function, (2) the level of

government funding, (3) the extent of government involvement or regulation, and (4) whether the entity was created by the government or to avoid the requirements of the Public Records Act.

*Id.* at paragraph two of the syllabus.

{¶ 13} HRO argues that the Foundation is the functional equivalent of a public office under a balancing of the *Oriana House* factors. The Foundation argues the opposite, contending that HRO has not met its burden to show by clear and convincing evidence that any of the four factors cuts in favor of finding that it is the functional equivalent of a public office. *See State ex rel. Griffin v. Sehlmeyer*, 167 Ohio St.3d 566, 2022-Ohio-2189, 195 N.E.3d 130, ¶ 9 (relator bears the burden of showing entitlement to the writ by clear and convincing evidence).

### A. Whether the Foundation Performs a Governmental Function

{¶ 14} The first factor of the functional-equivalency test asks whether the private entity performs a "historically governmental function" or one traditionally performed by private entities. *State ex rel. Bell v. Brooks*, 130 Ohio St.3d 87, 2011-Ohio-4897, 955 N.E.2d 987, ¶ 22. HRO argues that the Foundation performs a governmental function in that the Foundation is "tasked through the MOU" with receiving and distributing funds from the state and local governments' settlements of the opioid litigation. The allocation of these public funds, says HRO, is a uniquely governmental function that state and local governments have transferred to the Foundation under the terms of the MOU.

{¶ 15} The Foundation frames the "historically governmental function" prong differently. The Foundation argues that it is directly receiving settlement proceeds from *private* actors (i.e., the pharmaceutical-supply-chain defendants in the opioid litigation) and that it will then "distribute that money to organizations that can best use it to alleviate the effects of the opioid crisis." Emphasizing that the MOU and the Foundation's creation are "unique and unprecedented" in this

6

state, the Foundation contends that the distribution of settlement proceeds obtained in the opioid-litigation cases cannot be deemed "uniquely" or "historically" governmental.

{¶ 16} The Foundation also relies on *State ex rel. Repository v. Nova Behavioral Health, Inc.*, 112 Ohio St.3d 338, 2006-Ohio-6713, 859 N.E.2d 936. In *Repository*, we suggested that we would be more likely to conclude that a private entity is performing a governmental function if "presented with the situation in which a public agency transfers one of its own functions to [that] private entity." *Id.* at ¶ 28. The Foundation contends that like the community mental-health services at issue in *Repository*, the services the MOU requires the Foundation to use the settlement funds for—namely, providing substance-abuse treatment, education, and prevention services—are not exclusively governmental and are, in fact, performed by private entities.

{¶ 17} We disagree with the Foundation's argument. For one thing, the Foundation misstates its function. The Foundation is not responsible for *providing* substance-abuse treatment, education, and prevention services. Rather, the Foundation is responsible for disbursing settlement funds for purposes consistent with the MOU. Unlike the private entity we examined in *Repository*, the Foundation is not performing a function performed by private entities.

{¶ 18} Moreover, the Foundation's true function is a historically governmental one. The state and local governments that are parties to the MOU have agreed to allocate 55 percent of the opioid-litigation settlement proceeds to the Foundation, which in turn is charged with disbursing that revenue in accordance with the "approved purposes" specified in the MOU. Under Ohio law, when the Foundation disburses those funds, it is engaged in the disbursement of public money. *See* R.C. 117.01(C) (defining "public money" as including "any money collected by any individual * * * as a purported representative or agent of the public

office"). Accordingly, we conclude that the Foundation is performing a historically governmental function—the disbursement of public money.

*B. Level of Government Funding*

**{¶ 19}** "The fact that a private entity receives government funds does not convert the entity into a public office for purposes of the Public Records Act." *Oriana House*, 110 Ohio St.3d 456, 2006-Ohio-4854, 854 N.E.2d 193, at ¶ 29. However, the level of government funding an entity receives is a relevant factor to consider. *Id.* at ¶ 32.

**{¶ 20}** HRO argues that the Foundation receives 100 percent of its funding from government sources. Under the MOU, the Foundation receives 55 percent of all "opioid funds," defined as monetary amounts obtained through a settlement joined by the state and local governments. The MOU arguably provides for additional funding by the state and local governments in a provision stating, "The State of Ohio and the Local Governments understand and acknowledge that additional steps should be undertaken to assist the Foundation in its mission, at a predictable level of funding, regardless of external factors." Elsewhere, the MOU states that the Foundation "will partner with the State of Ohio to increase revenue streams." Thus, HRO argues, the MOU does not specify nongovernmental funding of the Foundation. HRO also contends that as of January 4, 2023, the Foundation's operational expenses have been paid for entirely by the attorney general while the Foundation awaits receipt of settlement proceeds for its funding. Specifically, HRO submitted evidence of a $1 million payment from the attorney general's office to the Foundation in September 2022, which was earmarked for Foundation "startup expenses."[2]

---

2. The Foundation says that this and other evidence submitted by HRO does not comply with S.Ct.Prac.R. 12.06. The Foundation fails to develop this assertion into an argument; it merely raises the issue in a footnote in its merit brief. It quotes S.Ct.Prac.R. 12.06(A) at length but does not explain which provision of the rule the evidence fails to comply with. Moreover, the Foundation does not expressly object to HRO's evidence, much less dispute the authenticity of it.

{¶ 21} While acknowledging that the MOU allocates to the Foundation a portion of the settlement proceeds, the Foundation emphasizes that these "are monies paid by *private* actors in settlement of litigation." (Emphasis sic.) Thus, the Foundation contends, the funds it receives "will not come directly from state or local government coffers" or be "generated through the imposition of state or local taxation, assessment, or fees." Moreover, the Foundation notes that the MOU contemplates receipt of funds other than settlement proceeds in that the MOU expressly provides that the Foundation may receive stocks, bonds, real property, and cash in addition to settlement proceeds. Thus, the Foundation argues that HRO has not met its burden to show that the Foundation receives a significant level of government funding.

{¶ 22} We disagree with the Foundation's argument that the settlement proceeds it receives are purely private funds. As we noted above, the Foundation is tasked with receiving and disbursing settlement proceeds payable to the state and local governments that are parties to the opioid litigation. These settlement proceeds are public money. But characterizing the settlement proceeds as public money does not end the inquiry under this factor. When considering the government-funding factor in our functional-equivalency cases, we have examined the percentage of the private entity's total revenues that come from public sources. *See Repository*, 112 Ohio St.3d 338, 2006-Ohio-6713, 859 N.E.2d 936, at ¶ 32-33 (92 percent of entity's revenue coming from government source was "significant"); *Oriana House*, 110 Ohio St.3d 456, 2006-Ohio-4854, 854 N.E.2d 193, at ¶ 32 (88 percent from government sources was "significant"); *Bell*, 130 Ohio St.3d 87, 2011-Ohio-4897, 955 N.E.2d 987, at ¶ 23 (same).

{¶ 23} In this case, while there is evidence of the source of the Foundation's funding—most notably, 55 percent of the opioid-litigation settlement proceeds allocated to it under the MOU—the record contains no clear evidence of what percentage of the Foundation's *total* revenue comes from public sources.

Accordingly, here, unlike in *Repository*, *Oriana House*, or *Bell*, we are unable to determine whether the Foundation's level of government funding is "significant" as a percentage of its total revenue. HRO therefore has not met its burden of proving that this factor weighs in its favor.

### C. *Extent of Government Involvement*

{¶ 24} In applying this factor, we consider the extent to which "any government entity controls the day-to-day operations" of the private entity. *Oriana House* at ¶ 33. HRO emphasizes the fact that the Foundation was created by state and local governments and that the MOU dictates (1) the makeup of the Foundation's board, (2) that the governor appoint the Foundation's executive director, and (3) that the Foundation comply with the "approved purposes" identified in the MOU.

{¶ 25} For its part, the Foundation argues that there is no hint of government control over its day-to-day operations. Even though government officials serve on its board of directors, the Foundation notes that this does not equate with government involvement in its day-to-day operations for purposes of this factor. *See Bell*, 130 Ohio St.3d 87, 2011-Ohio-4897, 955 N.E.2d 987, at ¶ 24 (evidence that individual county commissioners made up the board of directors of a private corporation did not prove government control over day-to-day operations).

{¶ 26} On the record before us, HRO has the better of the arguments regarding this factor. Contrary to the Foundation's position, there is evidence of government involvement in its day-to-day operations. Under the Foundation's code of regulations, its day-to-day operations are managed by an executive director, who is appointed by the governor. Thus, an appointee of the governor is responsible for the day-to-day operations of the Foundation, which is a circumstance that distinguishes the Foundation from the private entities in *Bell* and *Repository* that we found not to be controlled by government entities.

{¶ 27} Just as importantly, under the MOU and the Foundation's regulations, the disbursement of opioid-litigation settlement funds—the main purpose of the Foundation—cannot occur without the board's approval. This is significant because the board consists of government officers and appointees: 10 of the 29 board members are appointed by the state (by either the legislature, governor, or attorney general), and local governments participate in choosing the remaining members. Thus, the Foundation cannot perform its essential function without the participation of government appointees. Moreover, the way in which the Foundation has conducted its business thus far carries an air of government involvement. The evidence shows that the Foundation's May 16, 2022 board meeting was organized by the interim director of RecoveryOhio (an organization commissioned by the governor) and was held at the Ohio Department of Public Safety, where RecoveryOhio typically holds its meetings. Thus, the Foundation appears to operate in tandem with RecoveryOhio. And as noted previously, the attorney general's office paid for the Foundation's startup operating expenses.

{¶ 28} Accordingly, there is government involvement in the day-to-day operations of the Foundation as well as in the Foundation's ultimate performance of its essential function of disbursing opioid-litigation settlement funds.

### D. Creation of the Entity

{¶ 29} The fourth factor of the functional-equivalency test is whether the entity was *either* created by the government *or* established "as the alter ego of a governmental entity to avoid the requirements of the Public Records Act." *Oriana House*, 110 Ohio St.3d 456, 2006-Ohio-4854, 854 N.E.2d 193, at ¶ 34. Here, the Foundation's creation is spelled out in the MOU, which states that "[t]he *Parties shall create* a private 501(c)(3) foundation * * * for the purpose of receiving and disbursing [settlement funds] and other purposes set forth both herein and in the documents establishing the Foundation." (Emphasis added.) *See* 26 U.S.C. 501(c)(3). The MOU defines the term "the Parties" as including the state and local

governments.  Accordingly, the MOU establishes that government entities created the Foundation.

{¶ 30} The Foundation does not seriously dispute that it was created as a private nonprofit corporation by the parties specified in the MOU—i.e., the state and local governments.  However, it frames this factor differently, arguing that there is no evidence that it "was created as the alter ego of a governmental entity to avoid the requirements of the Public Records Act," *Oriana House* at ¶ 34.  Indeed, as the Foundation argues, the MOU contains a provision stating that its meetings shall be open and its documents public to the same extent as if the Foundation was a public entity.

{¶ 31} However, the Foundation's argument misstates the inquiry required under this factor.  In *Oriana House*, we recited the factor as "whether the entity was created by the government *or* to avoid the requirements of the Public Records Act." (Emphasis added.)  *Oriana House* at paragraph two of the syllabus and ¶ 25.  The test is in the disjunctive.  And here, as set forth in the MOU, the Foundation was created by the state and local governments.

*E.  Weighing of the Factors*

{¶ 32} "Applying the functional-equivalency test requires a case-by-case analysis, examining all pertinent factors with no single factor being dispositive." *Id.*, 110 Ohio St.3d 456, 2006-Ohio-4854, 854 N.E.2d 193, at ¶ 23.  In this case, three factors appear to support HRO's position that the Foundation is the functional equivalent of a public office while one factor (level of government funding) is, at best, equivocal.  Considering the totality of the factors, we conclude that the Foundation is the functional equivalent of a public office for purposes of the Public Records Act.

{¶ 33} When applying the functional-equivalency test, we consider whether providing public access to the records at issue "serve[s] the policy of governmental openness that underlies the Public Records Act." *Repository*, 112 Ohio St.3d 338,

2006-Ohio-6713, 859 N.E.2d 936, at ¶ 39.  In this case, allowing public access to the Foundation's records serves that policy.  In the absence of the MOU, opioid-litigation settlement funds would have flowed directly to either the state or the local governments that are parties to those cases.  *See* R.C. 109.21 ("The attorney general shall pay all moneys collected or received by the attorney general on behalf of the state into the state treasury to the credit of the general revenue fund"); R.C. 733.46(A) ("The treasurer of a municipal corporation shall receive * * * all funds of the municipal corporation and such other funds as arise in or belong to any department or part of the municipal corporation * * *"); R.C. 319.13 ("the county auditor shall certify all moneys into the county treasury" and "charge the treasurer with such moneys").  Instead, the state and local governments entered into the MOU to govern the disbursement of the settlement proceeds, with 55 percent of those funds diverted to the Foundation, a private entity created by the state and local governments.  And under the terms of the MOU and the Foundation's bylaws, the state and local governments are to be heavily involved in the Foundation's operation.

{¶ 34} Put another way, the state and local governments have delegated to the Foundation the task of spending public money.  Under this backdrop, the Foundation is the functional equivalent of a public office and subjecting it to the requirements of the Public Records Act is consistent with the act's policy of governmental openness.

## F. Foundation's Policy Arguments

{¶ 35} The Foundation warns that we will beget "negative consequences" if we determine that it is subject to the Public Records Act. The Foundation argues that such a ruling will jeopardize its ability to obtain tax-exempt status from the Internal Revenue Service and will hamper its ability to conduct business. The Foundation also fears that being subject to the Public Records Act will pose an obstacle to its ability to raise additional funds. And most importantly, the Foundation worries that being deemed a public office for purposes of the Public Records Act will somehow mean that the opioid-litigation settlement funds within its control "will be available for the Ohio General Assembly to use for purposes other than those set forth in the MOU," which the Foundation says the MOU "was designed to prevent." The Foundation harkens back to proceeds from the state's settlement with tobacco-product manufacturers, when the General Assembly reallocated funds from the Tobacco Use Prevention and Cessation Trust Fund to other purposes more than a decade ago. *See Tobacco Use Prevention & Control Found. Bd. of Trustees v. Boyce*, 127 Ohio St.3d 511, 2010-Ohio-6207, 941 N.E.2d 745, ¶ 2-5. The Foundation does not want the same fate for the opioid-litigation settlement funds.

{¶ 36} We are not persuaded by the Foundation's policy arguments. They are speculative in both law and fact. If the Foundation is the functional equivalent of a public office under the four-factor test this court articulated in *Oriana House*, then "the policy of governmental openness that underlies the Public Records Act," *Repository*, 112 Ohio St.3d 338, 2006-Ohio-6713, 859 N.E.2d 936, at ¶ 39, is the one that must be honored.

## G. Statutory Damages

{¶ 37} Under R.C. 149.43(C)(2), a requester of public records is entitled to recover statutory damages when (1) he submits a written public-records request "by hand delivery, electronic submission, or certified mail," (2) the request "fairly

describes the public record or class of public records to the public office or person responsible for the requested public records," and (3) "a court determines that the public office or the person responsible for public records failed to comply with an obligation" imposed by R.C. 149.43(B). Statutory damages accrue at $100 for each business day, starting from the day the mandamus action was filed, during which the public office failed to comply with R.C. 149.43(B), up to a maximum of $1,000. R.C. 149.43(C)(2).

{¶ 38} We deny HRO's request for statutory damages. Under R.C. 149.43(C)(2), we may reduce or deny statutory damages if we determine that (1) based on the law as it existed at the time of the request, a well-informed person responsible for the records reasonably would have believed that R.C. 149.43(B) did not require their disclosure and (2) a well-informed person responsible for the records reasonably would have believed that withholding the records would serve the public policy that underlies the authority asserted for withholding the records. Under the circumstances here and given that a private entity is *presumed* not to be subject to the Public Records Act, *Oriana House*, 110 Ohio St.3d 456, 2006-Ohio-4854, 854 N.E.2d 193, at ¶ 26, we believe that a well-informed person responsible for the Foundation's records could have reasonably believed the Foundation was a private corporation not subject to the Public Records Act. However, future private entities situated similarly to the Foundation should take notice that with this case as guidance, a well-informed person may draw a different conclusion in the future.

## H. Costs and Attorney Fees

{¶ 39} HRO also requests awards of court costs and attorney fees. Because we conclude that HRO is entitled to a writ of mandamus ordering the Foundation to provide public records responsive to its request, an award of costs to HRO is mandatory under R.C. 149.43(C)(3)(a)(i). *State ex rel. Hicks v. Fraley*, 166 Ohio St.3d 141, 2021-Ohio-2724, 184 N.E.3d 13, ¶ 25.

{¶ 40} As for attorney fees, an award is discretionary under R.C. 149.43(C)(3)(b). *Id.* at ¶ 26. We must deny attorney fees if (1) based on the law as it existed at the time of the request, a well-informed person responsible for the records reasonably would have believed that R.C. 149.43(B) did not require their disclosure and (2) a well-informed person responsible for the records reasonably would have believed that withholding the records would serve the public policy that underlies the authority asserted for withholding the records. *See* R.C. 149.43(C)(3)(c). These are the same factors used for determining whether a reduction or denial of statutory damages is appropriate under R.C. 149.43(C)(2). *Hicks* at ¶ 28.

{¶ 41} We deny HRO's request for attorney fees for the same reasons we deny its request for statutory damages. The Foundation reasonably believed that it was not subject to the Public Records Act, because it is a private corporation and therefore presumed not to be a "public office" under our case law. *See Oriana House*, 110 Ohio St.3d 456, 2006-Ohio-4854, 854 N.E.2d 193, at ¶ 26.

### III. CONCLUSION

{¶ 42} For the foregoing reasons, HRO has demonstrated by clear and convincing evidence that it has a clear legal right of access to the requested records and that the Foundation has a clear legal duty to provide access. We grant a writ of mandamus ordering the Foundation to provide to HRO the public records responsive to HRO's June 2022 public-records request. We award court costs to HRO but deny its requests for statutory damages and attorney fees.

Writ granted.

KENNEDY, C.J., and FISCHER, DEWINE, DONNELLY, STEWART, BRUNNER, and DETERS, JJ., concur.

_____

Graydon, Head & Ritchey, L.L.P., and John C. Greiner, for relator.

Benesch, Friedlander, Coplan & Aronoff, L.L.P., Robert A. Zimmerman,

and Mark D. Tucker, for respondent.

_____