[Cite as *Sheil v. Horton*, **2018-Ohio-1720.**]

| | |
|---|---|
| WILLIAM B. SHEIL | Case No. 2017-00772PQ |
| Requester | Special Master Jeffery W. Clark |
| v. | <u>REPORT AND RECOMMENDATION</u> |
| JOHN HORTON | |
| Respondent | |

{¶1} The Cuyahoga Community College Foundation is a tax-exempt, nonprofit entity incorporated in 1973 to solicit, receive, and hold public contributions for the benefit of the Cuyahoga Community College (Tri-C). (Court's Exh.[1] at 19-23, Articles of Incorporation.) Tri-C Foundation manages large sums of money in endowments and other accounts, and periodically transfers funds to Tri-C for distribution as scholarships and for other purposes. (Response, Exh. 1 Affidavit of Megan O'Bryan (O'Bryan Aff. I) at ¶ 5-6, 9-10; Sur-reply Affidavit of Megan O'Bryan (O'Bryan Aff. II) at ¶ 7.) The financial and administrative relationships between Tri-C and Tri-C Foundation are detailed in the Articles of Incorporation, the O'Bryan Affidavits, the Tri-C Basic Financial Statements For the Fiscal Years Ended June 30, 2017 and 2016, Note 17 – Discretely Presented Component Unit (Court's Exh. at p. 314-325.), and the Tri-C Foundation Audit for 2017/2016. (Court's Exh. at p. 30-59.)

{¶2} In June 2017, Tri-C Foundation engaged actress Octavia Spencer to speak at the annual Presidential Scholarship Luncheon fundraiser. (O'Bryan Aff. I at ¶ 13.) On August 21, 2017, requester William Sheil, a reporter for WJW-TV, sent an email to respondent John Horton, Media Relations Manager, Tri-C Integrated Communications Department, confirming "we made a request for the contract between Tri-C and Octavia Spencer for her upcoming appearance at a Tri-C luncheon * * * under Ohio's

---

[1] The court had requester's January 25, 2018 affidavit and attachments paginated for ease of reference. The resulting document, filed on April 6, 2018, is referenced as "Court's Exh."

Open Records Act." (Complaint at 2.) Horton responded that the contract was between Tri-C Foundation and Ms. Spencer and, "[b]ased upon the advice of counsel, the Foundation is unable to provide the contract. Ohio law establishes that the Cuyahoga Community College Foundation is not the functional equivalent of a public entity and is not subject to the Ohio Public Records Act." (*Id.* at 4.) On September 19, 2017, Sheil filed his complaint alleging denial of access to public records in violation of R.C. 149.43(B). On November 22, 2017, Horton filed his response, adding as a basis for denial that the contract constitutes a trade secret. Sheil filed a reply on January 25, 2018 and Horton filed a sur-reply on February 26, 2018. Horton filed a copy of the contract, under seal, on March 7, 2018.

{¶3} Ohio's Public Records Act, R.C. 149.43, provides a remedy for production of records under R.C. 2743.75 if the court of claims determines that a public office has denied access to public records in violation of R.C. 149.43(B). The policy underlying the Public Records Act is that "open government serves the public interest and our democratic system." *State ex rel. Dann v. Taft,* 109 Ohio St.3d 364, 2006-Ohio-1825, 848 N.E.2d 472, ¶ 20. Therefore, the Public Records Act "is construed liberally in favor of broad access, and any doubt is resolved in favor of disclosure of public records." *State ex rel. Cincinnati Enquirer v. Hamilton Cty.*, 75 Ohio St.3d 374, 376, 662 N.E.2d 334 (1996). Claims under R.C. 2743.75 are determined using the standard of clear and convincing evidence. *Hurt v. Liberty Twp.*, 5th Dist. Delaware No. 17CAI050031, 2017-Ohio-7820, ¶ 27-30.

{¶4} This case presents two issues: (1) whether Tri-C Foundation is subject to the Public Records Act, and (2) if so, whether its contract with a speaker for a fundraising event may be withheld as a trade secret. The evidence establishes (1) that Tri-C Foundation is subject to the Public Records Act, and (2) the speaker contract contains no material that falls under the definition of trade secret.

**Tri-C Foundation is a Public Institution, and Therefore a Public Office**

{¶5} The Public Records Act applies to "records kept by any public office." R.C. 149.43(A)(1). As used in the Act,

> "Public office" includes any state agency, *public institution*, political subdivision, or any other organized body, office, agency, institution, or entity established by the laws of this state for the exercise of any function of government.

(Emphasis added.) R.C. 149.011(A). The mere fact that it is a private, non-profit corporation does not preclude an entity from being a public office. *State ex rel. Freedom Communications, Inc. v. Elida Community Fire Co.*, 82 Ohio St.3d 578, 579, 697 N.E.2d 210 (1998). A private entity is a public institution under R.C. 149.011(A), and thus a public office for purposes of the Public Records Act, when it serves as the "functional equivalent of a public office." *State ex rel. Oriana House, Inc. v. Montgomery*, 110 Ohio St.3d 456, 2006-Ohio-4854, 854 N.E.2d 193, ¶ 21-26. Under the functional equivalence test, the court must analyze all pertinent factors, including but not limited to:

(1) whether the entity performs a governmental function,

(2) the level of government funding,

(3) the extent of government involvement or regulation, and

(4) whether the entity was created by the government or to avoid the requirements of the Public Records Act.

*Id.* at ¶ 25. The analysis begins with the presumption that private entities are not subject to the Public Records Act absent a showing by clear and convincing evidence that the private entity is the functional equivalent of a public office. *Id.* at ¶ 26. No single factor is dispositive – all pertinent factors must be weighed and balanced in each case, mindful of the policy of openness that underlies the Public Records Act. *Id.* at ¶ 23; *State ex rel. Repository v. Nova Behavioral Health, Inc.*, 112 Ohio St.3d 338, 2006-Ohio-6713, 859 N.E.2d 936, ¶ 24, 38-39.

**Application of Functional Equivalency Test to Tri-C Foundation:**

**A. Performance of Governmental Function**

**{¶6}** This factor asks whether the entity performs a traditionally governmental function. *Oriana House* at ¶ 28. "Governmental function" includes the provision of a system of public education. R.C. 2744.01(C)(2)(c). Public institutions of higher learning such as Tri-C and its component units are part of this traditional function, including their receipt of funding from the state and other sources. R.C. 3358.08(C); R.C. 3358.09; Ohio Constitution, Article VIII, Section 2(e), (f). "The receipt and solicitation of gifts * * * is an indispensable function of any institution of higher learning." *State ex rel. Toledo Blade Co. v. Univ. of Toledo Found.*, 65 Ohio St.3d 258, 262, 602 N.E.2d 1159 (1992).

**{¶7}** Tri-C Foundation solicits and receives public donations, to be distributed as scholarships to persons attending Tri-C and for other purposes benefiting Tri-C. (O'Brien Aff. I at ¶ 5; Court's Exh. at 41.) The Tri-C Foundation thus performs an indispensable sub-function within Tri-C's traditional governmental education function. This factor weighs strongly in favor of Tri-C Foundation's status as the functional equivalent of a public office.

**B. Level of Government Funding**

**{¶8}** Courts have expressed the level of government funding as the percentage of an entity's total revenues that come from public sources. *See Oriana House* at ¶ 32; *Nova Behavioral* at ¶ 32. Respondent asserts that Tri-C Foundation received $227,268 of contributed services from Tri-C in fiscal year 2017 for "administrative, general, and fundraising expenses." (Response at 6; O'Bryan Aff. I at ¶ 32.) Respondent applies this value against the $9.2 million that Tri-C Foundation collected in contributions, grants, and special events revenue, and claims that government funding was only 2.47 percent. (Response at 6; O'Bryan Aff. I at ¶ 33.)

**{¶9}** While contributions, grants and special event receipts are "revenue" as an accounting concept, almost all such revenue collected by Tri-C Foundation is destined

for Tri-C. These moneys no more "fund" the Foundation than if they were artworks or real estate physically collected and transferred, intact, to Tri-C. A more meaningful measure of government funding of a fund-raising entity is the percentage of its operational expenses that come from public sources. The Foundation's Statement of Activities for fiscal year 2017 shows expenses for Administration and General $193,027, Special Events $72,628, and Fundraising $447,328, for a total of $712,983. (Court's Exh. at 38.) Applying the $227,268 received from Tri-C against this figure, the government funded portion of Tri-C Foundation's operating expenses is a more substantial 32 percent.

{¶10} Moreover, even using the broad concept of "revenue" as all moneys received, Tri-C Foundation revenues consist mostly or entirely of public money. "Public money" is defined by R.C. 117.01(C) to mean "any money received, collected by, or due a public official under color of office, as well as *any money collected by any individual on behalf of a public office or as a purported representative or agent of the public office.*" (Emphasis added.) "Public money" includes money raised by a nonprofit corporation for a public office. 2016 Ohio Atty. Gen. Ops. No. 2016-013 at *68-70. Under this definition, it appears that 100 percent of Tri-C Foundation's total revenues come from public sources.

{¶11} Regardless, there is no threshold amount of government funding for an entity to be considered the functional equivalent of a public office. In this case, most or all of Tri-C Foundation's operating expenses are funded by a combination of direct government contributions from Tri-C, and a portion of the public moneys it has collected. Despite any ambiguity as to whether receipt of "public moneys" equates with "public sources," I find that this factor weighs moderately to strongly in favor of the foundation's status as the functional equivalent of a public office.

**Extent of Government Involvement or Regulation**

{¶12} While Tri-C does not control the day to day activities of Tri-C Foundation, the two are closely intertwined. Tri-C Foundation is co-located with Tri-C in Tri-C facilities, where it is administratively involved with Tri-C by using contributed Tri-C staff time, technological services, office services, and office equipment. (O'Bryan Aff. I at ¶ 25-32.) Tri-C Foundation is listed on the Tri-C web site as a Tri-C Administrative Department.[2] In Tri-C's Organizational Chart, Tri-C Foundation and the Vice President of Development compose a unit directly under the President of the College. (Court's Exh. at 226.[3]) Tri-C Foundation uses Tri-C email addresses through Tri-C servers. The Tri-C Foundation web presence is entirely on the Tri-C web site.[4] Tri-C Foundation apparently has no paid employees of its own. (Court's Exh. at 85; O'Bryan Aff. I at ¶ 30-32; O'Bryan Aff. II at ¶ 10.)

{¶13} Tri-C Foundation is so fiscally intertwined with Tri-C that it must be reported as "a component unit of" Tri-C in its audit filings. (Court's Exh. at 202, 236). As explained in Tri-C's Basic Financial Statements, Fiscal Years 2017 and 2016, Note 1 – Summary of Significant Accounting Policies:

> Component units are legally separate organizations for which the College is financially accountable or for which the nature and significance of their relationship with the College are such that exclusion would cause the College's financials to be misleading. GASB Statement No. 39. *Determining Whether Certain Organizations Are Component Units*, requires the College to reflect the [Tri-C Foundation] as a discretely presented component unit in the financial statements based on the significance of the relationship with the College. * * *
>
> The economic resources received or held by the Foundation that the College is entitled to or has the ability to access are significant to the College.

---

[2] http://www.tri-c.edu/administrative-departments/index.html. (Accessed April 16, 2018.)

[3] Tri-C FY 2018 Approved Budget Book, p. 13. http://www.tri-c.edu/about/documents/budget-book.pdf (Accessed April 16, 2018.)

[4] http://www.tri-c.edu/give/index.html. (Accessed April 16, 2018.)

(Court's Exh. at 261.) The economic resources that Tri-C "is entitled to or has the ability to access" are received and held pursuant to the purpose stated in Tri-C Foundation's articles of incorporation: "To receive, hold, invest, and administer property of any kind, including money" for distribution to, or for the benefit of, Tri-C. (*Id.* at 20.) The court is not persuaded by respondent's contrary statement that "[t]he Foundation does not hold funds for the College or in the College's name. (O'Bryan Aff. I at ¶ 8.) In addition to outside donors in 2017, Tri-C Foundation recognized $870,874 from Tri-C itself in the form of contributions and special events revenue, e.g., external parking revenue and funds for special events sponsorships. (O'Bryan Aff. II at ¶ 9.) The majority of all Tri-C Foundation revenue ultimately becomes available to Tri-C for scholarships and other purposes, in annual amounts determined by Tri-C Foundation. (O'Bryan Aff. I at ¶ 5, 9-12; O'Bryan Aff. II at ¶ 7.)

{¶14} These entities are involved in other ways. Although respondent asserts that Tri-C Foundation does not currently exercise all of its available corporate functions (Sur-reply at 4; O'Bryan Aff. II at ¶ 6.), the purposes established in the Articles of Incorporation include (in addition to fundraising):

1. To make expenditures for charitable, scientific, literary or education purposes for the benefit of Tri-C, including to make expenditures for any normally accepted function of colleges,

2. To acquire, construct, equip, furnish, repair, remodel, renovate, enlarge, improve, maintain and operate buildings, structures, and facilities, and to acquire real estate in conjunction therewith for the use of Tri-C, its staff, faculty, students, or any organization thereof or related or affiliated thereto,

3. To establish and maintain programs for the purpose of financially assisting, directly or indirectly, by gift, loan, guaranty, or otherwise students attending Tri-C,

4. To engage in and conduct special activities on behalf of Tri-C, its staff, faculty, students, or any organization thereof or related or affiliated thereto.

5. To attempt to influence legislation.

(Court's Exh. at 20-22.) Tri-C and Tri-C Foundation thus have additional, significant areas of mutual involvement available at their discretion. For example, Tri-C Foundation spent $100,000 to $200,000 supporting lobbying efforts on behalf of Tri-C in each of fiscal years 2014-2016. (Court's Exh. at 100-102, 137-140, 172-175.)

{¶15} Finally, Tri-C is guaranteed substantial involvement in the governance of Tri-C Foundation through four *ex officio* positions for Tri-C officers on the Tri-C Foundation Board of Directors. (O'Bryan Aff. I, Exh. A.)

{¶16} This factor weighs moderately in favor of Tri-C Foundation's status as the functional equivalent of a public office.

### C. Whether Entity was Created by the Government or to Avoid the Requirements of the Public Records Act

{¶17} In August 1973, Tri-C's then-Vice President of Finance, Dante Biello, incorporated the Tri-C Foundation. (Court's Exh. at 19-23, Articles of Incorporation.) Biello also signed as the agent for statutory service, giving as the service address, "Cuyahoga Community College District, 2214 East 14th Street." (*Id.* at 24.) *See State ex rel. Luken v. Corp. for Findlay Mkt. of Cincinnati*, 2012-Ohio-2074, 972 N.E.2d 607, ¶ 25 (1st Dist.) ("Because the city requested the creation of a nonprofit corporation to manage and operate Findlay Market, we * * * find that the city created CFMC."). There is no evidence that the foundation was created to avoid the Public Records Act.

{¶18} The broad purposes of the Foundation are exclusively for the benefit of the Board of Trustees of the Cuyahoga Community College District. (Court's Exh. at 19-23.) The articles provide that "[u]pon any dissolution of the corporation all of the corporation's property of every nature and description shall be paid over and transferred to the Board of Trustees of the Cuyahoga Community College District * * *." (*Id.* at 22-23.) Thus, in its birth, its life, and even in its death, the Tri-C Foundation was created solely to serve Tri-C.

{¶19} This factor weighs strongly in favor of Tri-C Foundation's status as the functional equivalent of a public office.

**Weighing of Factors**

{¶20} The four primary *Oriana House* factors all weigh in favor of the Tri-C Foundation as the functional equivalent of a public office. The foundation was created to perform the governmental function recognized in *Toledo Foundation, supra*, and performs that function with substantial or complete governmental funding. Tri-C is closely involved with Tri-C Foundation in its housing, personnel, technical and other administrative operations, auditing, and governance. By the terms of its incorporation, Tri-C Foundation could not exist apart from Tri-C. In purpose and practice it is an alter ego of Tri-C. Weighing and balancing these factors, I find clear and convincing evidence that Tri-C Foundation is the functional equivalent of a public office.

**Functional Equivalence – Additional Factors**

{¶21} The *Oriana House* list of factors is non-exhaustive, and the court may consider additional pertinent information. *Oriana House* at ¶ 22-25. The following additional information reinforces Tri-C Foundation's status as the functional equivalent of a public institution:

<u>Tri-C Foundation is Treated as a Public Office by the Auditor of State</u>

{¶22} R.C. 117.10(A) provides that "the auditor of state shall audit all public offices as provided in this chapter."[5] R.C. 117.11 then details the timing, scope, and manner of public office audits. The language defining "public office" in R.C. 117.01(D) is identical to that in R.C. 149.011(A). Only public offices are audited under R.C. 117.11.

{¶23} In 2016, the Ohio Auditor of State (AOS) requested an opinion from the Attorney General as to whether private nonprofit corporations acting as major gift-receiving and soliciting arms of public colleges and universities were subject to audit as "public offices." 2016 Ohio Atty. Gen. Ops. No. 2016-013. The Auditor's request explained that nearly all state colleges and universities in Ohio are now supported by

---

[5] R.C. 117.10 separately provides for audits of certain private entities.

foundations established as private nonprofit corporations under R.C. Chapter 1702.[6] While cautioning that the determination of whether a public college or university foundation is a "public office" is fact-dependent, the Attorney General advised the AOS that

> a public college or university foundation established as a private nonprofit corporation under R.C. Chapter 1702, the primary purpose of which is to solicit and receive, on behalf of a state college or university, gifts, donations, and bequests made for the benefit or use of the state college or university, and which is responsible for keeping records of donations for the state college or university,[7] is an entity established by the laws of this state for the exercise of a function of government, and is, therefore, a public office under R.C. 117.01(D).

*Id.* at *5. The Attorney General found the language of R.C. 117.01(D) identical to that in 149.011(A), and referred to public records cases in reaching his opinion. While the Attorney General's determination that particular entities are public offices under R.C. 117.01(D) is not determinative of the question of whether the entities are public offices under R.C. 149.011(A), the reasoning of the opinion is persuasive.

{¶24} In 2017 the AOS reviewed the Independent Auditor's Report of the Tri-C Foundation for fiscal year 2017 and advised Tri-C Foundation that, "[b]ased upon this review, we have accepted these reports in lieu of the audit required by Section 117.11, Revised Code." (Court's Exh. at 193.) The AOS treatment of Tri-C Foundation as a public office subject to audit under R.C. 117.11, using a definition of "public office" identical to that in public records law, supports the finding that it is the functional equivalent of a public office. *See State ex rel. Dist. 1199 v. Lawrence Cty. Gen. Hosp.*, 83 Ohio St.3d 351, 353, 699 N.E.2d 1281 (1998) (pre-*Oriana House* case

---

[6] R.C. Chapter 1702 *Nonprofit Corporation Law*. Tri-C Foundation was incorporated "under the Non-Profit Corporation Law of the State of Ohio." (Court's Exh. at 20.)

[7] This phrase is an apparent reference to the holding in *Toledo Found.* at 263 that "the solicitation and receipt of donations for the [University], and keeping records of that activity, are government functions." Tri-C Foundation keeps records of its activity in the solicitation and receipt of donations for Tri-C.

finding "this conclusion, that the [entity] is a 'public office' subject to R.C. 149.43, is supported by the other uncontroverted evidence here, [including] treatment by the State Auditor of the [entity] as a public office for purposes of R.C. 117.11.").

{¶25} I find that the Attorney General's analysis of college and university foundation status as public offices under statutory language identical to R.C. 149.011(A), and the Auditor's specific finding that Tri-C Foundation is a public office under that language, both weigh strongly in favor of Tri-C Foundation's status as the functional equivalent of a public office.

### Toledo Blade v. University of Toledo Foundation

{¶26} Horton seeks to distinguish this case from *State ex rel. Toledo Blade Co. v. Univ. of Toledo Found.*, 65 Ohio St.3d 258, 263, 602 N.E.2d 1159 (1992). (Sur-reply at 9-10.) Although a pre-*Oriana House* case, the factors considered in *Toledo Foundation* were not overruled. Instead, the Court noted that it had "considered factors similar to the factors in the functional-equivalency test in making the determination" in cases including *Toledo Foundation. Oriana House* at ¶ 24. The Court summarized the pertinent factors in *Toledo Foundation* as: "A private nonprofit corporation that acts as a major gift-receiving and soliciting arm of a public university and receives support from public taxation is a 'public office' pursuant to R.C. 149.011(A)." *Id.* It is thus significant that there is no material distinction between the facts here and those in *Toledo Foundation.*

{¶27} The University of Toledo Foundation (UT Foundation) articles of incorporation provided that its sole purpose was "to receive, hold, invest and administer property and to spend funds for the benefit of the university." *Toledo Foundation* at 261. UT Foundation "employed and paid its own staff, paid rent to the university for its office space, and was supported by private donations." *Id.* Two predecessor foundations had operated out of university office space without paying rent, and the university had paid the wages and benefits of their employees. *Id.* After consolidation of the two into the

UT Foundation, the university continued to pay retirement system benefits on behalf of foundation employees who had previously been university employees. *Id.* at 262. The new foundation held $17 million in endowed funds in the name of the university, and $23 million in its own name. *Id.* The conclusion drawn from these facts was that "the foundation is not a mere supplementary benefactor of the university. It is a major gift-receiving and soliciting entity of the university, and its transaction records do document its activities." *Id.*

{¶28} The Tri-C Foundation articles of incorporation also include the purpose to receive, hold, invest and administer funds for Tri-C. Unlike the UT Foundation, Tri-C Foundation does not pay rent for office space in Tri-C property, or pay for Tri-C staff time, office services, or office equipment, which is accounted for only by an internal charge-back (described as "consideration for the Foundation's fundraising and donor engagement"). (O'Bryan Aff. I at ¶ 25, 28, 31.) The contributed services of Tri-C staff necessarily include all benefits they receive, including retirement benefits. Notably, the UT Foundation had no members of the University of Toledo on its staff, and had no members of the university on its board of trustees. *Toledo Foundation* at 267 (Holmes, J. dissenting). In contrast, Tri-C is guaranteed four *ex officio* seats on the Tri-C Foundation Board of Directors, and Tri-C Foundation uses the contributed time of Tri-C employees as its staff, including that of the current president of the Tri-C Foundation, Tri-C Vice President of Development Megan O'Bryan. (O'Bryan Aff. I at ¶ 2.) As a pertinent factor in making a functional equivalence determination, the *Oriana House* Court noted that "[a]t least one court has factored in whether the entity's officers and employees are government officials or government employees." (Citation omitted.) *Oriana House* at ¶ 22. If anything, the facts regarding Tri-C Foundation are stronger than those in *Toledo Foundation* in favor of functional equivalence.

{¶29} The other factor mentioned in *Toledo Foundation* was that it received support from public taxation. As its basis for finding in the affirmative, the Court noted

only that rent-free use of public buildings supported by public taxation constitutes support by public taxation, citing *State ex rel. Fostoria Daily Review Co. v. Fostoria Hosp. Assn.*, 40 Ohio St.3d 10, 12, 531 N.E.2d 313 (1988). *Toledo Foundation* at 261. *See generally State ex rel. Dist. 1199 v. Lawrence Cty. Gen. Hosp.*, 83 Ohio St.3d 351, 699 N.E.2d 1281 (1998). Neither party describes how the Tri-C host facility was funded, but to the extent taxpayer money was involved, for example by the retirement of bond issues through public taxation, Tri-C Foundation has been supported by public taxation. *Id.* Similarly, the contributed use of the email system and server; technology support; and the time of six Tri-C resource development staff, the Tri-C Executive Director for Accounting and Financial Operations, and Ms. O'Bryan, also constitute "government funding," whether from taxpayer moneys or other public college funds. (O'Brien Aff. I at ¶ 25-32; O'Bryan Aff. II at ¶ 10.)

**{¶30}** This additional pertinent information weighs moderately to strongly in favor of Tri-C Foundation's status as the functional equivalent of a public office.

### Requirement of Liberal Interpretation in Favor of Disclosure

**{¶31}** Even were this question closer, the court must construe R.C. 149.43 liberally in favor of broad access in weighing the factors. *Oriana House* at ¶ 35.

> In addition, "doubts as to the 'public' status of any entity should be resolved in favor of finding it subject to the disclosure statute."

(Citation omitted.) *State ex rel. Strothers v. Wertheim*, 80 Ohio St.3d 155, 156, 684 N.E.2d 1239 (1997). The Supreme Court has explained that:

> We adopted the functional-equivalency test in *Oriana House* because it is best suited to the overriding purpose of the Public Records Act, which is "to allow public scrutiny of public offices, not of all entities that receive funds that at one time were controlled by the government." Id. at P 36. By homing in on the functional realities of a particular contractual arrangement, the functional-equivalency test provides greater protection against unintended public disclosures while affording a more suitable framework for determining the extent to which an entity has actually assumed the role of a governmental body.

*State ex rel. Repository v. Nova Behavioral Health, Inc.*, 112 Ohio St.3d 338, 2006-Ohio-6713, 859 N.E.2d 936, ¶ 24. This is not a case where Tri-C Foundation merely received funds that at one time were controlled by the government. Providing public access to this contract, which represents a substantial expenditure of public moneys by a major gift-receiving and soliciting entity for a government function, clearly serves the policy of openness that underlies the Public Records Act.

### Tri-C Foundation as a "Person Responsible for Public Records" of Tri-C

{¶32} A private entity that is not the functional equivalent of a public office may still be subject to the same responsibility, as a "person responsible for public records." R.C. 149.43(B)(1) and (C)(1) require either "a public office *or the person responsible for public records"* to produce requested records. "This language 'manifests an intent to afford access to public records, even when a private entity is responsible for the records.'" *State ex rel. Cincinnati Enquirer v. Krings,* 93 Ohio St.3d 654, 657, 758 N.E.2d 1135 (2001). A separate, private entity is "a person responsible for public records" under the Public Records Act where:

(1)  the private entity prepares records in order to carry out a public office's responsibilities;
(2)  the public office is able to monitor the private entity's performance, and
(3)  the public office has access to the records for this purpose.

*State ex rel. Carr v. Akron,* 112 Ohio St.3d 351, 2006-Ohio-6714, 859 N.E.2d 948, ¶ 36. A private entity may be a person responsible for public records regardless of whether it is acting as the public office's agent. *State ex rel. Mazzaro v. Ferguson,* 49 Ohio St.3d 37, 39, 550 N.E.2d 464 (1990).

### Prepares Records to Carry Out Public Office's Responsibilities

{¶33} As noted above, the receipt and solicitation of gifts is an indispensable function, and therefore an accepted responsibility of any institution of higher learning. *Toledo Foundation* at 262. More broadly, responsibilities of any public office include

exercising management of financial resources, such as investment authority. *State ex rel. Toledo Blade Co. v. Ohio Bur. of Workers' Comp.*, 106 Ohio St.3d 113, 2005-Ohio-3549, 832 N.E.2d 711, ¶ 21-22. The Presidential Scholarship Luncheon is a long-standing and important fundraising event of Tri-C Foundation. (O'Bryan Aff. I at ¶ 11, 14; O'Bryan Aff. II at ¶ 8.) Tri-C Foundation creates records including the speaker's contract to document its general fundraising responsibility, and by extension the responsibility of Tri-C to solicit and receive gifts for its education function. Respondent's statement that "[t]he Presidential Scholarship Luncheon is not a responsibility of the Foundation or of the College" conflates the general responsibility to document fundraising, with the responsibility to hold any particular event. (O'Bryan Aff. II at ¶ 8.)

### Public Office Able to Monitor Performance

{¶**34**} Tri-C occupies four *ex officio* seats on the Tri-C Foundation board. Common purposes of *ex officio* seats for public offices include a guaranteed presence to monitor activity. Since the Tri-C Foundation Board's Directors have control over the property and all the business and financial affairs of the Foundation (O'Bryan Aff. I at ¶ 7.), the Tri-C officers' *ex officio* seats provide it with regular opportunity to monitor Tri-C Foundation's performance. The accounting rules tying Tri-C Foundation to Tri-C as its "component unit" provide additional monitoring of overall performance through joint audit reports. While there is no evidence that Tri-C specifically monitored the contract with Ms. Spencer (O'Bryan Aff. I at ¶ 36-52.), it was clearly aware through its involved staff of the scheduling and planning of the Presidential Scholarship Luncheon.

### Public Office has Access to the Records for this Purpose

{¶**35**} The records at issue are kept in a Tri-C facility, under lock in the office of Tri-C Vice President Megan O'Bryan. (O'Bryan Aff. I at ¶ 50.) The amount of the speaker fee is also presumably reflected in the check ledger and other accounting entries in Tri-C Foundation's financial books and records. According to its Form 990

filings, these financial records are kept by Tri-C's Executive Director, Accounting and Financial Operations, who is not a director or officer of Tri-C Foundation. (Court's Exh. at 84, 122; O'Bryan Aff. II at ¶ 10.) Tri-C had access to the requested record, and demonstrated access in Horton's unquestioning response to the court's order that the Tri-C Foundation contract be filed under seal. *See S/O ex rel. Am. Ctr. for Econ. Equal. v. Jackson*, 2015-Ohio-4981, 53 N.E.3d 788, 796, ¶ 33 (8th Dist.) (production of other records of performing entity demonstrated public office's access).

**Horton's Actions Consistent with "Person Responsible For" Records**

{¶36} Sheil made his request for a contract "between Tri-C and Octavia Spencer" to Tri-C Media Relations Manager John Horton. Instead of declining to accept the request or forwarding it, Horton responded on behalf of Tri-C Foundation. (Complaint at 4.) Horton does not assert that he has separate employment with the Tri-C Foundation, and has not disputed the jurisdiction of this court over him in connection with the request. Horton's actions were appropriate for a person acting on behalf of an entire office and its subdivisions. *State ex rel. Consumer News Servs. v. Worthington City Bd. of Ed.*, 97 Ohio St.3d 58, 65, 2002-Ohio-5311, 776 N.E.2d 82, ¶ 23, 40. Were Tri-C Foundation an entirely separate office, Horton could have forwarded the request and moved to be dismissed from this action. *See State ex rel. Keating v. Skeldon*, 6th Dist. Lucas No. L-08-1414, 2009-Ohio-2052 (finding assistant prosecutor and county public affairs liaison not "persons responsible" for records of county dog warden).

{¶37} Tri-C Foundation President O'Bryan's behavior also reflects the intertwining of Tri-C and Tri-C Foundation. The Spencer contract identifies the "client" as "Ms. Megan O'Bryan, *Vice President, Development* & Tri-C Foundation," the italicized text representing her position at Tri-C. The section of Background labeled "About the Organization:" begins "From the Client:" and then describes only Tri-C history, statistics, facilities, and programs, not those of Tri-C Foundation. In signing for

Tri-C Foundation, O'Bryan uses a combination of her college and foundation titles: "*VP, Cuyahoga County Community College Foundation.*"

**{¶38}** Fundamentally, "governmental entities cannot conceal information concerning public duties by delegating these duties to a private entity." *Krings*, 93 Ohio St.3d 654, 659, 758 N.E.2d 1135 (2001). The public has a "right of access to public records, regardless of where they are physically located, or in whose possession they may be." *Mazzaro*, 49 Ohio St.3d 37, 40, 550 N.E.2d 464 (1990). The Supreme Court recognizes the significant public interest in, and right to know, from whom donations to institutions of higher learning come, and how they are spent:

> No one would dispute the significant legitimate public purpose served by government in establishing and supporting institutions of higher education. The University of Toledo is a public institution and the solicitation and receipt of donations for the university, and keeping records of that activity, are government functions. There is, moreover, significant public interest in knowing from whom donations come and how that relates to where the university, as a public institution, chooses to spend its money. Nondisclosure by the foundation would obscure the sometimes significant link between a gift and its eventual use.

*State ex rel. Toledo Blade Co. v. Univ. of Toledo Found.*, 65 Ohio St.3d 258, 263, 602 N.E.2d 1159.

**{¶39}** Tri-C District created the Tri-C Foundation to delegate a responsibility to fund scholarships and other student assistance. Tri-C monitors Tri-C Foundation performance, and has demonstrated access to its records, making the foundation a "person responsible for public records" in a relationship of quasi-agency. *State ex rel. ACLU v. Cuyahoga Cty. Bd. of Comm'rs,* 128 Ohio St.3d 256, 2011-Ohio-625, 943 N.E.2d 553, ¶ 52-54.

### Application of Claimed Exception

**{¶40}** Respondent asserts that even if Tri-C Foundation is determined to be subject to the Public Records Act, the withheld contract is subject to protection as a

trade secret under the Ohio Uniform Trade Secrets Act,[8] which is "a state law exempting trade secrets from disclosure under R.C. 149.43." *State ex rel. Perrea v. Cincinnati Pub. Sch.*, 123 Ohio St.3d 410, 2009-Ohio-4762, 916 N.E.2d 1049, ¶ 19. Respondent bears the burden of proof to establish the applicability of the claimed exception:

> Exceptions to disclosure under the Public Records Act, R.C. 149.43, are strictly construed against the public-records custodian, and the custodian has the burden to establish the applicability of an exception. * * * A custodian does not meet this burden if it has not proven that the requested records fall squarely within the exception.

*State ex rel. Cincinnati Enquirer v. Jones-Kelley*, 118 Ohio St.3d 81, 2008-Ohio-1770, 886 N.E.2d 206, ¶ 10.

### Ohio Uniform Trade Secrets Act

R.C. 1333.61(D) provides that:

> "Trade secret" means information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:
>
> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

An *in camera* inspection is usually necessary to determine if a claim of trade secret has merit. *State ex rel. Besser v. Ohio State Univ.*, 87 Ohio St.3d 535, 541-542, 721 N.E.2d 1044 (2000) ("*Besser I*").

---

[8] Although Horton did not cite this exemption in his response to Sheil's request, he is permitted to raise it in defense of this litigation. "The explanation [provided when denying a request] shall not preclude the public office * * * from relying upon additional reasons or legal authority in defending an action commenced under division (C) of this section." R.C. 149.43(B)(3).

The following factors are to be used in analyzing a trade secret claim:

(1) The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*State ex rel. Besser v. Ohio State Univ.,* 89 Ohio St.3d 396, 732 N.E.2d 373, 399-400 (2000) ("*Besser II*").

### Contents of Contract

The contents of the contract between Tri-C Foundation and Ms. Spencer are set forth under the following categories and topic titles:

| | |
|---|---|
| Speaker<br>Fees<br>Expenses<br>Client<br>Event Name<br>Appearance Date<br>Location:<br>Speech Title/Topic<br>Timetable<br><br>**CONTRACT REQUIREMENTS**<br><br>Exclusivity<br>Additional Requirements<br>Media<br>Recording Instructions<br>Technical Requirements | **BACKGROUND**<br><br>About the Organization<br>Website<br>About the Event<br>Audience Profile<br>Venue<br>Hotel<br>Speaker's Attire<br>Audience's Attire<br>Previous Speakers<br>Sponsors<br><br>**CONTACT INFORMATION**<br><br>Pre-Event Contact<br>Onsite Contact<br><br>**PAYMENT** |

Tri-C does not assert any other express or incorporated terms of this contract, but did attach a "Speaking Engagement Proposal for Octavia Spencer," which, together with the contract form as it existed on June 14, 2017, appears to have been the bid document for this speaking engagement.

### Scope of Claimed Exception

{¶41} Respondent does not allege that the contract would reveal any "scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement." Respondent asserts only that the terms are "business information that (1) derives independent economic value, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (Response at 9-10.)

### Respondent Fails to Identify Specific Information as Trade Secret

{¶42} When trade secret is asserted as an exception, "[a]n entity claiming trade secret status bears the burden *to identify* and demonstrate that the material is included in categories of protected information under the statute." (Emphasis added.) *Besser II* at 398-400; *Perrea* at ¶ 25. Respondent does not identify any term with particularity as trade secret other than "fees" paid. (Response at 12; O'Bryan Aff. I at ¶ 37-38.) I find that respondent has not met his initial burden under the statute to identify material claimed as included in a category of protected information, other than fees paid.

{¶43} Similarly, respondent has not identified any portion of the included Speaking Engagement Proposal for Octavia Spencer as trade secret, or submitted any evidence in support. The proposal does not contain a proposed fee amount. I find that respondent fails to meet his burden to show that any portion of the Speaking Engagement Proposal for Octavia Spencer constitutes trade secret. *See Besser II* at 400-401.

**Respondent Fails to Demonstrate Specific Information as Trade Secret**

{¶44} "An entity claiming trade secret status bears the burden to identify *and demonstrate* that the material is included in categories of protected information under the statute * * *." (Emphasis added.) *Besser II* at 400; *Perrea*, *supra*. A proponent's "reliance on conclusory affidavit statements is insufficient to satisfy its burden to identify and demonstrate that the records withheld and portions of records redacted are included in categories of protected information under R.C. 1333.61(D)." *Besser II* at 400-404.

{¶45} Applying the *Besser* factors to this contract, the evidence shows that:

(1)  Most of the information in the contract (parties, scheduling, topic, etc.) is already known outside of Tri-C Foundation. The fee information is also known outside – by the speakers bureau and Ms. Spencer, with no legal limitation on their ability to disclose the information to others.

{¶46} On review *in camera*, the contents of the following contract topic titles were either advertised in advance, became public knowledge at the event, or were otherwise known by the public at the time of the request: *Speaker, Client, Event Name, Appearance Date, Location, Speech Title/Topic, Timetable, Technical Requirements*; and all topics under the categories *Background* and *Contact Information*; as well as the signature lines. On their face, these items have no plausible independent economic value to others, and respondent offers no argument to the contrary.

{¶47} Publicly available information as to Ms. Spencer's speaking fee includes her March 2017 Kent State University contract posted online,[9] and her fee range advertised through multiple speakers bureaus.[10] As to the fee paid here, Tri-C Foundation made no effort to control disclosure of contract terms by the other party,[11]

---

[9] https://localtvwjw.files.wordpress.com/2017/05/contract.pdf (Accessed April 16, 2018.)

[10]  https://www.celebrityspeakersbureau.com/talent/octavia-spencer-2/ "Fee Range: $50,000 - $100,000" (Accessed March 27, 2018.); http://speakerbookingagency.com/talent/octavia-spencer/ "Fee Range: $50,000 - $100,000" (Accessed April 16, 2018.)

[11] Although the contract restricts publication of the speaker's participation until full execution of the contract and payment of the deposit, those actions were to be completed by July 21, 2017, well

and there is no evidence that the Washington Speakers Bureau or Ms. Spencer are restricted by Tri-C from disclosure of its contract terms to anyone. As an indicator of Ms. Spencer's inclination to disclose, her contract with Kent State University provided that "Speaker may disclose the amount of the Fee for 'quote' purposes." (Court's Exh. at 16.)

> (2) All information known outside Tri-C Foundation is also known by those inside, except that the amount of the fee is known to only a few persons inside Tri-C Foundation.

{¶48} O'Bryan testifies that she alone participated in contract negotiations for the speaker, that no other Foundation staff has a copy of or access to the contract, and that the Board is not typically aware of the specific terms of the speakers' contracts. (O'Bryan Aff. I at ¶ 46-52.) Most or all of the other information in the contract would be well known to those inside Tri-C Foundation as part of their jobs, or, as with the attending public, would become known at the time of the event.

{¶49} Respondent alleges that "certain speakers are also reluctant to speak if the terms of their contracts will be publically [sic] available." (O'Bryan Aff. at ¶ 39.) However, unlike her recent contract with Kent State University, the Spencer contract with Tri-C contains no enduring confidentiality clause.[12]

> (3) Tri-C Foundation has taken no precautions to guard the information other than as noted in factor (2). Respondent provides no evidence that either Octavia Spencer or the Washington Speakers Bureau consider the fee amount to be a trade secret of theirs.

Tri-C Foundation may never seek the speaking services of Ms. Spencer again, but Ms. Spencer continues to hold her future speaking services out to the public, and it is

---

before the August 21, 2017 public records request. This only notes the absence of effort to protect, since information cannot meet the statutory trade secret definition merely by its reference in an agreement of confidentiality in any case. *State ex rel. Plain Dealer v. Ohio Dep't of Ins.*, 80 Ohio St.3d 513, 527, 687 N.E.2d 661 (1997).

[12] A non-disclosure agreement with a public office is invalid in any case. *State ex rel. Findlay Publ. Co. v. Hancock Cty. Bd. of Commrs.*, 80 Ohio St.3d 134, 137, 684 N.E.2d 1222 (1997); *State ex rel. Gannett Satellite Info. Network v. Shirey*, 78 Ohio St.3d 400, 403, 678 N.E.2d 557 (1997).

she, if anyone, who would have an interest in protecting dissemination of the fee she charges for the various negotiating advantages respondent alleges. However, respondent provides no evidence that Ms. Spencer has ever claimed her fee, or any other speaking contract term, as a trade secret. As noted above, public evidence of her fee for Kent State University and the public posting of her fee range show just the opposite.

> (4) Respondent provides no evidence of any savings achieved, or the value to the holder in having the information as against competitors, other than conclusory hypothetical statements.

{¶50} Respondent relies on only the following conclusory statements regarding the economic value of keeping its payment to Ms. Spencer secret from the public:

> 36. If information related to the terms of the contracts for the Presidential Scholarship Luncheon, including Ms. Spencer's, were publically [sic] available, the Foundation would be forced to match or beat previous contract terms in future speakers' contracts,

> 37. In my experience, knowledge by speakers of terms of previous contracts would impair the Foundation's ability to pay speakers the lowest fee possible because potential speakers often utilize previous contracts as benchmarks when negotiating their speaking fees.

> 38. Without secrecy regarding the terms of speaker contracts speakers would be able to command higher fees from the Foundation for speaking at the Presidential Scholarship Luncheon.

> 39. Certain speakers are also reluctant to speak if the terms of their contract will be publically [sic] available, so the public disclosure of contract terms will impede the Foundation's ability to contract with the speaker it may want for future Presidential Scholarship Luncheons.

> 40. From my current and my previous executive experience, I understand that other organizations would be better positioned to negotiate for speakers if the terms of the Foundation's contracts were publicly available as these other organizations will be aware of the terms we have offered and be able to meet or surpass them.

(Response at 12; O'Bryan Aff. I at ¶ 36-40.) Notably lacking is any factual evidence or expert testimony to support these conclusions. *See Besser II* at 402. Nor does respondent attempt to quantify the economic value of withholding the information.

{¶51} Respondent does not explain how disclosure of Ms. Spencer's fee would affect Tri-C Foundation's negotiations with future speakers who have different and unique values, such as sports figures, former presidents, poets, and journalists (categories of past Tri-C speakers). See *State ex rel. Toledo Blade Co. v. Ohio Bureau of Workers' Comp.*, 106 Ohio St.3d 113, 2005-Ohio-3549, 832 N.E.2d 711, ¶ 26-28 (Pfeifer, J. concurring). Instead, respondent states only the conclusion that disclosure of the fee it paid Ms. Spencer would force Tri-C Foundation to match those terms in future speaker's contracts, as an established minimum. (O'Bryan Aff. I at ¶ 36.) Respondent also argues that disclosure of this year's fee will enable other organizations to best them in bidding wars for future speakers. (O'Bryan Aff. I at ¶ 40.) Given the wide variables of speakers, dates, fee ranges, host organizations, audiences, alternates and other factors, both of these hypotheticals are strained.

{¶52} The special master is not persuaded that the fee paid for this single, unique speaking engagement derives any independent economic value from being kept secret. *See Besser II* at 400-402.

(5) Respondent provides no evidence of the amount of effort or money expended in "obtaining and developing" the fee it paid in this instance;

(6) Respondent provides no evidence of the amount of time and expense it would take for others to acquire and duplicate the information.

{¶53} Respondent makes no attempt to quantify the amount or value of Tri-C contributed staff time spent deciding on the fee Tri-C Foundation would offer, or the amount or value of time it would take others to settle on making the same fee offer.

**The Besser Factors do not Support a Finding of Trade Secret in this Case**

{¶54} The statutory and *Besser* factors are unsupported by any factual evidence, except for confidentiality of the contract within Tri-C Foundation. Respondent cites no

case precedent where a personal service fee is held to be a trade secret of a public office hiring the person, citing only cases involving customer lists and reusable civil service exam questions. Respondent offers no example from 25 years of this event where withholding past fee information has enabled Tri-C Foundation to negotiate lower future fees. Review of the contract *in camera* fails to convince the special master that competitor institutions would accomplish any significant savings of time or expense by knowing the specific fee paid by Tri-C Foundation in this instance. I find that respondent has provided no evidence to demonstrate that the amount of the fee paid to Ms. Spencer "derives independent economic value, actual or potential, from not being generally known."

{¶55} I conclude that respondent fails to show that any part of the Spencer contract falls squarely within the definition of trade secret.

**Conclusion**

{¶56} Upon consideration of the pleadings and attachments, I find by clear and convincing evidence that Tri-C Foundation is the functional equivalent of a public office, and a person responsible for public records. I further find respondent has failed to show that any material in the requested contract constitutes trade secret. I therefore recommend that the court ORDER respondent to provide Sheil with an unredacted copy of the contract as submitted under seal. I further recommend that Sheil be entitled to recover the amount of the filing fee and any other costs associated with the action that he has incurred. R.C. 2743.75(F)(3)(b).

{¶57} *Pursuant to R.C. 2743.75(F)(2), either party may file a written objection with the clerk of the Court of Claims of Ohio within seven (7) business days after receiving this report and recommendation. Any objection shall be specific and state with particularity all grounds for the objection. A party shall not assign as error on appeal the court's adoption of any factual findings or legal conclusions in this report and recommendation unless a timely objection was filed thereto. R.C. 2743.75(G)(1).*

JEFFERY W. CLARK
Special Master

**Filed April 16, 2018**
**Sent to S.C. Reporter 5/4/18**