[Cite as *Newman v. Greater Columbus Arts Council*, 2026-Ohio-1569.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Michael Newman, | : | |
| Requester-Appellant, | : | No. 25AP-238 (Ct. of Cl. No. 2024-00619PQ) |
| v. | : | (ACCELERATED CALENDAR) |
| Greater Columbus Arts Council et al., | : | |
| Respondents-Appellees. | : | |

D E C I S I O N

Rendered on April 30, 2026

**On brief:** *Michael Newman*, pro se. **Argued:** *Michael Newman*.

**On brief:** *Porter, Wright, Morris & Arthur LLP, Steven P. Goodin, Hannah E. McCarthy Mezher*, and *Mitchell A. Ray*, for appellees. **Argued:** *Steven P. Goodin*.

APPEAL from the Court of Claims of Ohio

DINGUS, J.

{¶ 1} Requester-appellant, Michael Newman, appeals a judgment of the Court of Claims of Ohio granting 3 of 13 parts of Newman's request for records from respondents-appellees, the Greater Columbus Arts Council and the Columbus Film Commission, a.k.a. Film Columbus (referred to individually by name or collectively as "GCAC"), and denying the remainder of Newman's request. For the reasons that follow, we reverse and remand the matter to the Court of Claims for further proceedings.

## I. Facts and Procedural History

{¶ 2} The Greater Columbus Arts Council is a non-profit organization that promotes the arts in the Columbus area through financial and other support to local artists and arts organizations, as well as annual community events. Film Columbus was a separate

non-profit organization from 2006 until 2020, when it was dissolved and became a division of the Greater Columbus Arts Council. In July 2024, Newman sent a 13-part public record request to GCAC, seeking the following records created between 2015 and 2024:

1. All complete Film Columbus financial reports/expense & revenue reports/budget reports from the years 2015-2024 with line item breakdowns showing how this public funding was spent.

2. All Film Columbus annual reports from the years 2015-2024.

3. All travel expense reports with receipts from Film Columbus executive director John Daugherty for the years 2015-2024 with complete line item breakdowns.

4. All Film Columbus expense reports with line item breakdowns for consulting fees, marketing & research studies or reports, and filmmaker production visits for the years 2015-2024.

5. All invoices from 2015-2024 pertaining to all companies, consultants, and independent contractors paid by Film Columbus.

6. All financial reports/expense reports/budget reports and invoices pertaining to the Ohio Film Studio Feasibility Study conducted by SHM Partners in 2023.

7. An actual copy of the 2023 feasibility report conducted by SHM Partners.

8. All expense reports for all pitch competitions and all film summits conducted by Film Columbus from 2015-2024.

9. All expense reports for all workshops conducted by Film Columbus from 2015-2024.

10. All Film Columbus expense reports pertaining to all advocacy efforts for the Ohio Motion Picture Tax Credits from 2015-2024.

11. All Employment Reviews/Assessments/Valuations of John Daugherty from the years 2015-2024 conducted by GCAC, the Film Columbus Board of Trustees and/or the GCAC Board of Trustees.

12. All bylaws & codes of rules and regulations for the Boards of Trustees for both Film Columbus and GCAC.

13. All contracts between Film Columbus, GCAC, and the City of Columbus from 2015-2024.

(Aug. 8, 2024 Compl. at 2, Ex. A.)

{¶ 3} Newman asserted that GCAC was obligated to produce the records under two public-records laws: (1) the Public Records Act, R.C. 149.43, which generally governs the records of public offices, and (2) R.C. 149.431, which specifically governs certain financial records of non-profit organizations and governmental entities that contract with public offices. GCAC declined to produce records in response to Newman's request.

{¶ 4} Newman filed a complaint at the Court of Claims pursuant to R.C. 2743.75, alleging that GCAC had denied him access to public records. The court assigned the case to a special master. After the parties unsuccessfully attempted to resolve their issues in mediation, they submitted evidentiary materials for the special master's consideration.

{¶ 5} As part of the Court of Claims' review, the special master examined GCAC's annual reports based on the submitted evidentiary materials and by taking judicial notice of GCAC's publicly available website, where the annual reports are posted. GCAC's annual reports include information about its board members, employees, annual events, artist profiles, art installations, grants, awards, and summaries of GCAC's revenue and expenses for the year. Film Columbus is included in the annual reports from 2020 to 2024. The revenue summaries from 2020 to 2024 indicate that GCAC received most of its funding from municipal, county, and state government sources, ranging from approximately 88 to 93 percent of GCAC's total revenue.

{¶ 6} GCAC contracts with the City of Columbus (the "City") on a yearly basis to receive funds from the City's Hotel-Motel Excise Tax and Admissions Tax and to disburse those funds for arts and cultural programs, as well as grants to artists and arts organizations, for the benefit of the local community. *See* Columbus City Codes 371.02(c) and 375.03. A 2024 contract between the City and GCAC relating to the Hotel-Motel Excise Tax was entered into evidence. The contract indicates that GCAC was "serving as the official recognized representative of, and advisory body to the CITY for cultural facilities, programs, projects, and activities." (2024 Contract at 3.) The contract indicates that five members of GCAC's board of trustees and two members of the board's executive committee must be appointed by the City. GCAC must work with the City on establishing annual goals and continually monitoring those goals. The regular meetings of GCAC's board of trustees, along with the minutes of those meetings, must be open to the public.

{¶ 7}    During proceedings before the special master, GCAC generally asserted that it was not obligated to comply with the Public Records Act because it was not a public office nor was it the functional equivalent of a public office under Ohio law.    GCAC more specifically asserted that it did not maintain separate expense reports and invoices like the ones identified in parts 3, 4, 5, 8, 9, and 10 of Newman's requests.    GCAC noted that the information sought in some of those requests was contained in financial records that GCAC had already produced.    GCAC indicated that it did not possess records related to Film Columbus prior to its dissolution and transformation into a department of GCAC in 2020. GCAC substantiated these specific assertions through the sworn statements of its president and CEO.

{¶ 8}    The special master issued a report and recommendation in January 2025, recommending that Newman's claim be granted in part and denied in part.    The special master determined that, because GCAC contracts with government entities, its financial records related to those contracts constitute public records subject to disclosure under R.C. 149.431.    He concluded that the records in parts 1, 6, and 13 of Newman's request were financial records that GCAC was required to disclose, but that the records identified in parts 2, 7, 11, and 12 of Newman's request were not financial records.    He found that the records identified in the remainder[1] of Newman's request did not exist.

{¶ 9}    To decide whether GCAC would have to disclose the non-financial records in parts 2, 7, 11, and 12 of Newman's request pursuant to the Public Records Act, R.C. 149.43, the special master analyzed whether GCAC was the functional equivalent of a public office. The special master considered four factors, as described in *Oriana House*, to reach his conclusion: (1) whether GCAC performs a governmental function, (2) GCAC's receipt of governmental funding, (3) governmental involvement with or regulation of GCAC, and (4) whether GCAC was created by the government or created to evade the Public Records Act. *See State ex rel. Oriana House, Inc. v. Montgomery*, 2006-Ohio-4854, paragraph two of the syllabus.

---

[1] The special master's report and recommendation, as well as the Court of Claims' entry adopting the report and recommendation, does not address parts 5 and 8 of Newman's request. Those parts are of the same nature as parts 3, 4, 9, and 10 of Newman's request, and it appears that the omission of parts 5 and 8 was probably accidental. More importantly, the omission is irrelevant to Newman's arguments on appeal, and we therefore do not address it further.

{¶ 10} Regarding the first factor, the special master determined that GCAC's distribution of public funds to the Columbus arts community is a governmental function. Regarding the second factor, the special master found that governmental offices provide the vast majority of GCAC's funding. Regarding the third factor, the special master determined that "Newman has not shown that GCAC is either closely intertwined with the City or that the City significantly regulates GCAC's activities." (Jan. 23, 2025 Report & Recommendation at 4.) And regarding the fourth factor, the special master determined that there was no evidence presented that GCAC was created by the government or created to avoid compliance with R.C. 149.43. The special master concluded that "[t]he evidence is in equipoise here; Mr. Newman has shown two factors, but failed to show two other factors. That falls short of the clear and convincing evidence required to prove functional equivalence." *Id.* at 4. The special master also commented that Newman's ability to access GCAC's financial documents under R.C. 149.431 "cuts against equivalence." *Id.* at 5.

{¶ 11} Because the special master held that GCAC was not the functional equivalent of a public office, it was not obligated to produce any additional records under the general provisions of the Public Records Act, R.C. 149.43. Accordingly, the special master recommended granting Newman's claim regarding parts 1, 6, and 13 of his request, awarding filing fees and costs, and denying all other relief.

{¶ 12} Newman filed objections to the special master's report and recommendation, to which he attached evidentiary materials, some of which had not been presented to the special master. The Court of Claims overruled Newman's objections, adopted the special master's report and recommendation in full, and granted partial relief to Newman as recommended.

{¶ 13} Newman filed a timely notice of appeal, and the matter is now before this court.

## II. Assignments of Error

{¶ 14} Newman assigns the following four assignments of error for our review:

> [I.] The Court of Claims erred by concluding that Requestor [sic] has not shown sufficient involvement with or regulation of the Greater Columbus Arts Council by the City of Columbus.

[II.] The Court of Claims erred by concluding that Requester has not shown evidence that the Greater Columbus Arts Council was formed by the government.

[III.] The Court of Claims erred by concluding that the Greater Columbus Arts Council is not the functional equivalent of a public office.

[IV.] The Court of Claims erred by concluding that documents requested in Request #2 are not financial.

## III. Discussion

{¶ 15} Newman's first three assignments of error address whether GCAC is the functional equivalent of a public office and, therefore, whether the general disclosure requirements of the Public Records Act, R.C. 149.43, should apply to all of GCAC's records. Newman's fourth assignment of error addresses whether the specific financial-disclosure requirements of R.C. 149.431 should apply to one of GCAC's records. To the extent that we must apply statutory language to determine whether records are subject to disclosure, we use a de novo standard of review. *Welsh-Huggins v. Jefferson Cty. Prosecutor's Office*, 2020-Ohio-5371, ¶ 39, citing *Hurt v. Liberty Twp.*, 2017-Ohio-7820, ¶ 31-33 (5th Dist.), and *Sheil v. Horton*, 2018-Ohio-5240, ¶ 20 (8th Dist.). To the extent that we must review a trial court's factual findings, we apply an abuse of discretion standard of review. *Id.*

### A. The Public Records Act and the Functional-Equivalency Test

{¶ 16} The Public Records Act applies to a "[p]ublic office," R.C. 149.43(A)(1), which includes "any state agency, public institution, political subdivision, or other organized body, office, agency, institution, or entity established by the laws of this state for the exercise of any function of government." R.C. 149.011(A). The Public Records Act "is construed liberally in favor of broad access, and any doubt is resolved in favor of disclosure of public records." *State ex rel. Cincinnati Enquirer v. Hamilton Cty.*, 1996-Ohio-214, ¶ 9. However, it is "difficult for someone to compel a private entity to adhere to the dictates of the Public Records Act, which was designed by the General Assembly to allow public scrutiny of public offices, not of all entities that receive funds that at one time were controlled by the government." *Oriana House*, 2006-Ohio-4854, at ¶ 36. The Public Records Act cannot be enforced against a private entity "absent a showing by clear and convincing evidence that the private entity is the functional equivalent of a public office." *Id.* at paragraph one of the syllabus.

{¶ 17} Because the Public Records Act does not provide precise guidance to determine the line between a private entity and a public office, the Supreme Court of Ohio looked to jurisprudence across the country, as well as its own jurisprudence, to form a list of factors to consider when determining whether a private entity is the functional equivalent of a public office. *Id.* at ¶ 21-24 (collecting cases). The Supreme Court identified four specific factors that courts should consider as part of a functional-equivalency analysis: "(1) whether the entity performs a governmental function, (2) the level of government funding, (3) the extent of government involvement or regulation, and (4) whether the entity was created by the government or to avoid the requirements of the Public Records Act." *Id.* at paragraph two of the syllabus. The Supreme Court stressed that its list of factors is non-exhaustive and that trial courts should consider all pertinent factors under the totality of the circumstances when conducting a functional-equivalency analysis. *Id.* at ¶ 22-23.

{¶ 18} In his first and second assignments of error, Newman asserts that the Court of Claims made incorrect findings regarding his evidence (or lack thereof) supporting the third and fourth *Oriana House* factors. In his third assignment of error, Newman asserts that the court did not properly weigh the totality of the evidence pursuant to the *Oriana House* functional-equivalency analysis. We conclude that Newman's third assignment of error is meritorious and renders his first and second assignments of error moot.

{¶ 19} In adopting the special master's report and recommendation, the Court of Claims found that Newman satisfied the first two *Oriana House* factors, failed to satisfy the third factor, and presented no evidence regarding the fourth factor. It held that satisfying only two of the four *Oriana House* factors is insufficient to establish that a private entity is the functional equivalent of a public office. We find that the court's approach failed to properly weigh the totality of the evidence and did not adequately articulate its assessment of the third *Oriana House* factor, leaving us unable to evaluate the validity of its decision.

**1. Assessment of Government Involvement or Regulation**

{¶ 20} The Supreme Court stressed in *Oriana House* that trial courts should undertake a functional-equivalency analysis on a case-by-case basis, "examining all pertinent factors with no single factor being dispositive." *Id.* at ¶ 23, citing *Ry. Labor Executives Assn. v. Consol. Rail Corp.*, 580 F.Supp. 777, 778 (D.C. 1984), *Bd. of Trustees of Woodstock Academy v. Freedom of Information Comm.*, 181 Conn. 544, 555-556 (1980),

and *Memphis Publishing Co. v. Cherokee Children & Family Servs., Inc.*, 87 S.W.3d 67, 79 (Tenn. 2002). The nature of each factor should be considered and weighed within the unique context of the organizational arrangement between the public office and the private entity. *Memphis Publishing* at 77; *Trustees of the Walters Art Gallery, Inc. v. Walters Workers United, Council 67*, 492 Md. 92, 120 (2025).

{¶ 21} A wide variety of evidence could be relevant to any one factor, and some evidence might squarely fit a factor at first blush but become irrelevant when considered in its specific context. Some government involvement might not fit neatly into any of the factors, or it could fit into multiple factors. For example, it could be pertinent to the functional-equivalency analysis that all of a nonprofit's assets would transfer to a public office upon the nonprofit's dissolution. *See Sheil*, 2018-Ohio-5240, at ¶ 8 (8th Dist.); *Walters Art Gallery* at 121. The possibility of an asset transfer by itself does not necessarily fit into any of the *Oriana House* factors, or additional context might indicate that the asset transfer is relevant to the second and/or third *Oriana House* factors. Another pertinent fact would be whether any of the nonprofit's employees were government officials or employees. *Oriana House*, 2006-Ohio-4854, at ¶ 22, citing *Marks v. McKenzie High School Fact-Finding Team*, 319 Ore. 451 (1994). Providing for a non-profit entity's staffing needs might be relevant to the second *Oriana House* factor, while governmental participation in the nonprofit's operations would be relevant to the third factor.

{¶ 22} Each of the four *Oriana House* factors could take a variety of forms, particularly the third factor regarding governmental involvement with or regulation of a private entity. Governmental involvement or regulation could be in the form of the power to appoint a non-profit entity's officers. *See State ex rel. Harm Reduction Ohio v. OneOhio Recovery Found.*, 2023-Ohio-1547, ¶ 26 (public office controlled the appointment of the entity's executive director). Such involvement or regulation could take the form of monitoring and regulating the private entity's operations or performance. *See Woodstock Academy* at 554 (private entity's monetary and other statutory benefits were dependent on public office's examination and certification of the private entity's operations). It could be relevant to consider whether a public office participates in or controls the private entity's board of trustees. *See Harm Reduction* at ¶ 27 (all of the entity's board members were appointed by state or local government actors, and board meetings were held at a public

office's facilities); *Sheil* at ¶ 11 (public office represented 4 of the nonprofit's 60 board members). It could be relevant to consider whether a public office participates in the private entity's day-to-day operations. *See Harm Reduction* at ¶ 26-27 (governmentally-appointed executive director controlled the private entity's day-to-day operations, and private entity regularly conducted meetings in tandem with government entities); *Sheil* at ¶ 33 (public office shared equipment, office space, and administrative and technological services with a private entity).

{¶ 23} Conversely, certain governmental involvement or regulation might not weigh toward finding that a private entity is functionally equivalent to a public office, depending on the context. A public office requiring regular reports from a private entity does not necessarily indicate that the public office has any control over the matters reported. *See Walters Art Gallery* at 139 (reporting requirements regarding a private entity's bylaws and annual reports "promote transparency and accountability but do not amount to operational control"). A public office's statutory or contractual requirements regarding a private entity's use of specific public funds do not necessarily constitute control over the entity's day-to-day operations. *See State ex rel. Repository v. Nova Behavioral Health, Inc*, 2006-Ohio-6713, ¶ 34. The presence of government officials or employees on a private entity's board might not necessarily indicate governmental control over the private entity. *See State ex rel. Bell v. Brooks*, 2011-Ohio-4897, ¶ 24 (evidence that a private entity's board was comprised of commissioners from nine different counties did not prove that the state or a similar government entity controlled the private entity's operations).

{¶ 24} At bottom, context is important to all of the *Oriana House* factors, and it is particularly important to the third factor, given the variety of ways that a government entity could exert its control or influence, as well as the variety of ways that a particular corporate or organizational structure could be influenced or controlled. *See Woodstock Academy* at 554. Here, the special master's analysis regarding the third *Oriana House* factor was limited to holding "Mr. Newman has not shown that GCAC is either closely intertwined with the City or that the City significantly regulates GCAC's activities." (Report & Recommendation at 4.) If Newman had presented no evidence whatsoever regarding government involvement or regulation, the summary conclusion might have been sufficient. But because Newman did present some evidence of government involvement or

regulation, the special master's decision did not provide adequate context to allow us to assess his conclusion regarding the third *Oriana House* factor.

## 2. Consideration of Other Pertinent Factors

{¶ 25}  Within his third assignment of error, Newman asserts that the special master also should have considered specific additional factors including: (1) the similarities between GCAC's functions and those of the Ohio Arts Council, a state agency, (2) the City's delegation of certain functions to GCAC, (3) GCAC's role as a cultural representative of the City, and (4) the applicability of R.C. 149.431 to certain GCAC financial records.  The first three examples are relevant to the first *Oriana House* factor—whether the private entity performs a governmental function.  *See, e.g., Repository*, 2006-Ohio-6713, at ¶ 28 (discussing a public office's delegation of a duty or a private entity's performance of what is normally a public office's duty in the context of the first *Oriana House* factor); *Harm Reduction*, 2023-Ohio-1547, at ¶ 18, 33 (same); *State ex rel. Strothers v. Wertheim*, 1997-Ohio-349, ¶ 6-8 (under a pre-*Oriana House* analysis, discussing a nonprofit's role as a government office's public liaison in the context of whether the nonprofit "performs a public service").  The special master determined that the evidence weighed decisively in favor of finding that GCAC performs a governmental function, and he may well have considered Newman's examples during the deliberations leading to that determination.  Regardless, because we are ultimately remanding the matter to the Court of Claims for a reevaluation of all of the *Oriana House* factors, the special master will be free to consider Newman's examples anew.

{¶ 26} As for Newman's fourth example, the special master determined that the applicability of R.C. 149.431 to some of GCAC's financial records weighed against a finding that GCAC is the functional equivalent of a public office.  Newman contends that the applicability of R.C. 149.431 should weigh in favor of such a finding.  We disagree with both views.  The financial record disclosure requirements of R.C. 149.431 apply to "any governmental entity or agency and any nonprofit corporation or association" that enters into a service contract or agreement with a federal or state government entity, or an Ohio local government or taxing entity.  R.C. 149.431(A).  As was pointed out in *Oriana House*, the existence of R.C. 149.431 indicates that a non-profit entity may provide services for a public office without becoming a public office by default.  *Oriana House* at ¶ 32.  But

because the statute applies to public offices and private nonprofits alike, the statute does not help us draw the line between the two. The applicability of R.C. 149.431 would likely be redundant to the consideration of government funding under the second *Oriana House* factor. *See id.*

### 3. Totality of the Circumstances Versus Number of Factors

{¶ 27} The four *Oriana House* factors certainly provide the necessary starting point for determining whether a private entity is the functional equivalent of a public office. These factors examine the extent of the government's role in the entity's creation (fourth factor), its ongoing input into the entity (second factor), the entity's internal processes (third factor), and the entity's output (first factor). There can be no one definition or formula for the functional equivalent of a public office given " 'the myriad [of] organizational arrangements for getting the business of the government done. . . . The unavoidable fact is that each new arrangement must be examined anew and in its own context.' " *Woodstock Academy*, 181 Conn. 544 at 554, quoting *Washington Research Project, Inc. v. Dept. of Health, Edn., & Welfare*, 504 F.2d 238, 245-246 (D.C.Cir. 1974); *see also Memphis Publishing*, 87 S.W.3d at 77, citing *Washington Research Project* at 245-246. For this reason, we must consider the totality of the unique circumstances presented in each case to determine whether a private entity is functionally equivalent to a public office. *Oriana House* at ¶ 23.

{¶ 28} In addition to failing to articulate the reasoning for its findings regarding the inadequacy of Newman's evidence of the third *Oriana House* factor, the special master appears to have disregarded that factor entirely in his summation of the evidence. The special master's decision that Newman satisfied two of the four *Oriana House* factors, along with his conclusion that the evidence was therefore evenly balanced at two-to-two, appears to consider the factors in isolation to reach the conclusion that GCAC is not the functional equivalent of a public office. However, the very nature of considering the totality of the circumstances precludes considering individual factors in isolation. *See United States v. Arvizu*, 534 U.S. 266, 274 (2002) (explaining, in the context of a reasonable-suspicion analysis, that a "court's evaluation and rejection of [separate] factors in isolation from each other does not take into account the 'totality of the circumstances' ").

{¶ 29} The functional-equivalency analysis in *Oriana House* is not merely a series of four binary yes-or-no questions with a requirement of three or more "yes" answers to reach the conclusion that an entity is the functional equivalent of a public office. It is a "framework for determining the extent to which an entity has actually assumed the role of a governmental body." *Repository*, 2006-Ohio-6713, at ¶ 24. *See also Walters Art Gallery*, 492 Md. 92 at 130 ("The common thread running through each case is a focus on substance over labels, and a consistent inquiry into how closely the entity's operations and governance are tied to public authority."). Irrespective of whether a particular factor reveals governmental fingerprints or puppet strings, it remains relevant to an overall assessment of the government's role in the existence and functions of a private entity.

{¶ 30} That Newman's evidence on the third *Oriana House* factor may have been weaker does not warrant excluding that factor from the analysis. It must still be weighed along with all other relevant factors as a whole. Because the decision below does not include a consideration of the totality of the circumstances, including the third *Oriana House* factor, we are unable to assess whether the special master validly concluded that GCAC was not functionally equivalent to a public office.

### 4. Newman's Third Assignment of Error is Sustained

{¶ 31} In sum, the four *Oriana House* factors are neither exhaustive nor susceptible to an all-or-nothing application. They do not necessarily carry equal, fixed weight—as if each factor constituted 25 percent of a functional-equivalency analysis—but must instead be weighed collectively, with due regard to the relative strength or weakness of each. We recognize that, in some cases, the evidence will weigh so heavily on one side for a particular factor or for the totality of the evidence that no intense scrutiny is needed, and a simplified or summary explanation will suffice. Further, irrespective of a case's complexity, there is nothing wrong with summarizing a functional-equivalency analysis by listing which of the *Oriana House* factors were or were not satisfied. *See, e.g.*, *Harm Reduction*, 2023-Ohio-1547, at ¶ 31; *Oriana House*, 2006-Ohio-4854, at ¶ 35. But it is not a proper substitute for weighing the totality of the circumstances in the first place.

{¶ 32} Without adequate evidence that the Court of Claims engaged in the proper analysis to reach its conclusion that GCAC is not the functional equivalent of a public office, we are not able to conduct a meaningful review of the decision. We conclude that the matter

must return to the Court of Claims for additional findings and analysis of the evidence that was presented to the special master. Accordingly, we sustain Newman's third assignment of error.

### 5. Newman's First and Second Assignments of Error are Moot

{¶ 33} Newman's arguments in his first and second assignments of error relate to the special master's specific findings related to the third and fourth *Oriana House* factors. Because our reversal on Newman's third assignment of error will require the Court of Claims to revisit its analysis of all *Oriana House* factors on remand, his first and second assignments of error are moot.

{¶ 34} However, we do note that Newman's first assignment of error appears to be based entirely on new evidentiary materials that Newman attempted to provide to the Court of Claims and to this court, and which he did not provide to the special master in the first instance. The Court of Claims was not in a position to consider evidence that Newman submitted subsequent to the special master's report and recommendation. *Gannett GP Media, Inc. v. Ohio Dept. of Pub. Safety*, 2017-Ohio-4248, ¶ 8 (Ct. of Cl.) (the Court of Claims acts as a reviewing court regarding objections to a report and recommendation under R.C. 2743.75(F)(2) and cannot consider new evidence in the first instance). We likewise will not consider evidence that Newman submitted to this court for the first time on appeal. *State v. Ishmail*, 54 Ohio St.2d 402 (1978), paragraph one of the syllabus ("A reviewing court cannot add matter to the record before it, which was not a part of the trial court's proceedings, and then decide the appeal on the basis of the new matter.").

### B. Financial Records

{¶ 35} In his fourth assignment of error, Newman asserts that the Court of Claims erred in holding that R.C. 149.431 did not require GCAC to produce Film Columbus's annual reports from 2020 to 2024[2] in response to part two of Newman's records request. We disagree.

{¶ 36} R.C. 149.431 generally provides that when two government entities or a nonprofit and a government entity enter into a contract for services, that contract is a public

---

[2] Part two of Newman's request to GCAC was for "[a]ll Film Columbus annual reports from the years 2015-2024." (Aug. 8, 2024 Compl. at 2, Ex. A.) However, Newman concedes that GCAC does not have any responsive records regarding Film Columbus during the period from 2015 to 2020, and he indicates that his request has been narrowed to Film Columbus's annual reports from 2020 to 2024.

record, and the "financial records of any moneys expended in relation to the performance of the services pursuant to such contract" are also public records. R.C. 149.431(A). In a short list of exceptions, the statute provides that if an entity uses both public and private funds to render its contractual services, the financial records related to the use of private funds are not public records. R.C. 149.431(A)(3). We note that the statute, by its plain language, does not apply to financial records in the absence of a contract with a government entity, nor to the expenditure of private funds irrespective of the existence of a contract.

{¶ 37} In Newman's submission of evidence to the special master, one exhibit contains two pages that are purportedly an excerpt from Film Columbus's 2018 annual report, and another exhibit contains an excerpt from GCAC's 2023 annual report. The two annual reports appear to have a substantially similar format. The annual reports for GCAC in the record and publicly available online appear to be a summary of everything GCAC has done during the past year, and it does not differentiate between GCAC's actions pursuant to contracts with the City, actions pursuant to contracts with other entities, or actions that it took of its own accord. The report also does not differentiate between GCAC's expenditure of public funds and its expenditure of private funds.

{¶ 38} The Court of Claims concluded that such annual reports did not fall within R.C. 149.431 because they include financial documentation from both private and public funds. We agree with the court's conclusion. Moreover, there is no evidence in the record that Film Columbus entered into any contracts with government entities between 2020 and 2024, nor is there any evidence that Film Columbus continued to produce its own annual reports after 2020. In fact, the evidence implies that Film Columbus no longer has separate annual reports, given that GCAC's annual reports from 2020 onward include information about Film Columbus.

{¶ 39} Accordingly, we overrule Newman's fourth assignment of error.

**IV. Disposition**

{¶ 40} Given the foregoing, Newman's third assignment of error is sustained, his fourth assignment of error is overruled, and his first and second assignments of error are moot. Having sustained Newman's third assignment of error, we reverse the judgment of the Court of Claims of Ohio, and we remand the matter to that court to properly analyze all

of the *Oriana House* factors and to reach its decision on Newman's request based on the totality of the evidence.

*Judgment reversed*;
*cause remanded.*

JAMISON and EDELSTEIN, JJ., concur.

_____